Andrew Martineau WEBB, Laura Louise Webb, Adam Lynn Webb and Lydia Jeannine Webb, minors, By and Through their guardian ad litem, Jeannine Webb, and Jeannine Webb for herself, all as heirs of Lynn Martineau Webb and Jeannine Webb, as Personal Representative of the Estate of Lynn Martineau Webb, deceased, and Felicity Dawn Riding and Danielle Elaine Riding, minors, By and Through their guardian ad litem, Michael C. Roberg, and Monica Riding, all as heirs of Richard A. Riding, and Michael C. Roberg as Personal Representative of the Estate of Richard A. Riding, deceased, Plaintiffs,

v.

UNITED STATES of America and Does 1 Through 55, Inclusive, Defendants.

Cassie Anne CHARLESWORTH, Cara Lee Charlesworth, and Robert Lonnie Charlesworth, minors, By and Through their guardian ad litem Saundra Ayers Charlesworth, and Saundra Ayers Charlesworth, individually, all as heirs of Alan Robert Charlesworth, deceased, and Saundra Ayers Charlesworth, as Personal Representative of the Estate of Alan Robert Charlesworth, deceased, Plaintiffs,

v.

UNITED STATES of America, Defendant.

Civ. Nos. 90-C-625G, 90-C-826J.

United States District Court,
D. Utah, C.D.

Jan. 10, 1994.

Joel M. Allred and Kimberly Allred, Salt Lake City, UT, for plaintiffs Jeannine A.

Webb, et al., and Monica H. Riding, et al., in Civ. No. 90–C–625G (Webb, Riding cases).

Moses Lebovits, Lebovits & David, Los Angeles, CA, for plaintiffs Saundra A. Charlesworth, et al., in Civ. No. 90–C–826J (Charlesworth case).

Luke B. Marsh, U.S. Dept. of Justice, Washington, DC, and Mark Baylen, F.A.A., for defendant U.S.

J. THOMAS GREENE, District Judge.

This matter came on for a consolidated trial before the court without a jury on March 1 through March 19, 1993. Joel M. Allred and Kimberly Allred represented the plaintiffs, Jeannine A. Webb, et al., and Monica H. Riding, et al., in Civil No. 90–C–625G (Webb, Riding cases). Moses Lebovits represented the plaintiffs, Saundra A. Charlesworth, et al., in Civil No. 90–C–826J (Charlesworth case). Luke B. Marsh of the U.S. Department of Justice and Mark Baylen of the Federal Aviation Administration represented the defendant United States of America in all of the consolidated cases. The court heard live witness testimony, and received summaries of non-live witness testimony as well as deposition testimony. The parties offered numerous exhibits into evidence. On March 19, 1993, the court heard final arguments of counsel, after which the court permitted the filing of post trial memorandums and other submissions of counsel. Now having reviewed the evidence and legal memorandums, the court makes and enters the following:

## FINDINGS OF FACT

### I. BACKGROUND

1. On Friday, February 5, 1988, at approximately 3:00 p.m. Mountain Standard Time (MST), a Piper PA–28–181 Archer aircraft N8471F, while on a cross-country flight, crashed in Chaves County, New Mexico, less than seven nautical miles from the Roswell Industrial Air Center ("Roswell Airport").

2. The private pilot, Alan R. Charlesworth ("Charlesworth"), along with his two passengers, Lynn M. Webb and Richard A. Riding, were killed.

3. The Piper Archer aircraft N8471F, was leased by Charlesworth, from Executive Aircraft International, Inc., a Utah corporation doing business at the Salt Lake City International Airport ("Salt Lake Airport").

4. The flight originated at the Salt Lake Airport on February 5, 1988, at approximately 08:30 a.m. MST.

5. Pilot Charlesworth was authorized to fly under visual conditions, and had filed a visual flight rules ("VFR") flight plan. Charlesworth was a relatively inexperienced pilot. He had obtained his pilot's license a few months before the crash, and had accumulated 122 total hours piloting. He was not an "instrumented rated" pilot.

6. Aircraft operations are divided into two categories: flights conducted under Visual Flight Rules (VFR), and flights conducted under Instrument Flight Rules (IFR). These terms, IFR and VFR, are accepted aviation terminology, and are customarily used by members of the aviation community. Visual Flight Rules are found at 14 C.F.R. §§ 91.151 through 91.159. Instrument Flight Rules are found at 14 C.F.R. §§ 91.-167 through 91.193. In order to operate under Instrument Flight Rules, a pilot must undergo additional training and possess a current instrument rating. 14 C.F.R. §§ 61.-3(e) and 61.65.

7. In addition to describing the two types of aircraft operations, the acronyms IFR and VFR are also used to describe general weather conditions. VFR weather requires minimums of three miles horizontal visibility and a cloud ceiling of 1,000 feet above the ground. IFR weather is weather in which the VFR minimums are not met. The terms IFR and VFR may also be used to describe the instrument flying capability of an aircraft and/or the pilot. An aircraft equipped to fly in IFR weather conditions is said to be "IFR equipped." A pilot who is qualified to fly in IFR weather conditions is said to be "IFR rated."

8. An airport's "control zone" is usually defined as the area included in a five mile radius surrounding the airport, from the ground up to 14,500 feet. A pilot may not legally execute a VFR flight within the con-

trol zone unless minimum VFR weather conditions are present. Minimum VFR conditions outside a control zone are different than minimum VFR conditions inside a control zone. Inside a control zone, the pilot's minimum VFR conditions are the same as those used by meteorologists to describe minimum VFR weather conditions: at least three miles prevailing horizontal visibility and a cloud ceiling of at least 1000 feet.

9. When IFR weather conditions prevail at an airport (less than three miles horizontal visibility and/or a cloud ceiling of less than 1000 feet), pilots flying under a VFR flight plan may not enter an airport's control zone unless the pilot requests and obtains a "Special VFR" clearance. To obtain a Special VFR clearance, the reported prevailing horizontal visibility must be at least 1 mile. 14 C.F.R. § 91.157(d); ATCM ¶ 7–46. Once such a clearance is issued, the pilot has the duty to remain clear of clouds.

10. On February 4 and 5, 1988, prior to the crash, Pilot Charlesworth contacted Air Traffic Control Flight Service specialists ("FSS specialists") at the Cedar City Flight Service Station ("Cedar City FSS"), located at Cedar City, Utah, and at the Roswell Flight Service Station ("Roswell FSS"), located at Roswell, New Mexico. These FSS specialists are employees of the Federal Aviation Administration ("FAA"). The pilot also contacted Air Traffic Controllers, also employed by the FAA, at Salt Lake City, Utah, Albuquerque, New Mexico, and Roswell, New Mexico. Plaintiffs allege that the FAA employees who spoke with the pilot before the crash were negligent in that they provided the pilot misleading and inaccurate information concerning the weather and airport conditions in the Roswell area on the afternoon of February 5, 1988. Plaintiffs allege that this FAA negligence was the sole proximate cause of the crash. Defendant alleges that the crash was Pilot Charlesworth's sole responsibility.

11. A Flight Service Station ("FSS") is an FAA facility in which FSS specialists provide various services to pilots. These services include providing weather briefings and other pertinent weather and aeronautical information prior to and during flight, and receiving and processing flight plans. In fulfilling their duties to pilot's and passengers, FSS specialists must become familiar with the procedures and requirements of the *Flight Services Manual,* FAA Order 7110.10 ("FSM").

12. In providing weather briefings, FSS specialists rely primarily on forecast weather reports, including area forecasts, terminal forecasts, and winds aloft forecasts. They also utilize hourly surface weather observations taken at designated reporting points where there is a certificated weather observer. Normally, FSS specialists also have access to pictorial charts such as surface analysis charts, radar summary charts, and weather depiction charts. Pilots may obtain a pre-flight briefing by visiting a FSS, or by telephone conversation with a FSS specialist.

13. Ordinarily FSS specialists obtain weather information and aeronautical data from a computer system called LABS (Leased Service A/B system). The LABS Weather Message Switching Center is located at Kansas City, Missouri. This switching facility serves as the gateway for FSS specialists to obtain weather information for pilots. The FSS equipment used by the specialists to obtain and send weather information to and from the switching center consists of a keyboard and a video screen. If available, the weather requested by the specialist will appear on the specialists' video screen. If there is a circuit problem or difficulty with the computers, a back-up procedure is provided as set forth in the FSM ¶ 3–5.

14. FAA facilities can also access weather information prepared by the National Weather Service ("NWS"), at Roswell, New Mexico, and at other Flight Service Stations. The NWS communications system is a system separate from the FAA's communications system. NWS information also may be obtained through a switching center in Kansas City. The NWS has all of the weather data required to brief pilots who cannot be briefed "due to circuit problems" at an FSS, although NWS offices do not have information regarding airport conditions, and do not accept flight plans.

15. Before departure, a pilot may contact an FSS specialist to obtain weather briefings. Weather briefings generally fall into three types of categories: (a) standard briefings; (b) outlook briefings; and (c) abbreviated briefings.

### (a) *Standard Briefing*

The standard briefing is a complete briefing of weather and aeronautical information. The contents of a standard briefing are set forth in the FSM ¶ 3–10 and the *Airmen's Information Manual* ("AIM") ¶ 502b. After obtaining or receiving from the pilot certain information concerning the proposed flight, the FSS specialist will brief the pilot by translating, interpreting, and summarizing available information. This information will include information on weather systems affecting the flight, current weather conditions, en route and destination forecasts, upper winds, Notice to Airmen ("NOTAM's"), ATC delays, and requests for Pilot Weather Reports ("PIREP's") while in flight. If possible, the briefer will tell the pilot, in some logical sequence, what he can expect to find at departure, while en route, and at the destination airport. If the standard briefing is given within two hours of the proposed flight, or upon the pilot's request, the FSS specialist will also provide the pilot with current conditions applicable to the flight. If the pilot can go VFR only, and if sky conditions or visibility, would, in the specialist's judgment, make VFR flight doubtful, the specialist will give the pilot a "VNR" recommendation ("VFR Flight Not Recommended").

### (b) *Outlook Briefing*

An outlook briefing is provided when the proposed flight is six or more hours from the time of the briefing. It is not a standard briefing and is limited in its scope. The contents of an outlook briefing are set forth in the FSM ¶ 3–12. Outlook briefings do not include current conditions, but are limited to forecast data. FSM ¶ 3–12(a).

There are two types of outlook briefings depending whether the proposed flight is scheduled during or beyond the valid time of available forecast data.

If the flight is scheduled during the valid time of the available forecast data, the FSS specialist will inform the pilot of any forecasted adverse conditions, and will give a brief synopsis of the weather applicable to the proposed flight—the en route forecast, the destination forecast, and other information specifically requested by the pilot. FSM ¶ 3–12(a).

If the proposed flight is scheduled beyond the valid time of the available forecast data, the FSS specialist will limit the brief to a "general outlook," and will advise the pilot when complete forecast information will be available. At the pilot's request, the FSS specialist will transfer the call to, or provide the telephone number of, the appropriate NWS office. FSM ¶ 3–12(b).

During any outlook briefing the FSS specialist may provide the pilot with a VNR recommendation if, in the specialist's judgment, weather conditions are forecast which would make VFR flight doubtful.

### (c) *Abbreviated Briefing*

An abbreviated briefing is provided when a pilot asks for specific information, or when a pilot seeks to update or supplement a previous briefing. The contents of an abbreviated briefing are found in the FSM ¶ 3–11 and the AIM ¶ 502c.

If the pilot requests specific information, the FSS specialist will provide that information, and will inform the pilot of the existence of any adverse conditions, reported or forecast, which pertain to the information requested. The specialist will provide details of these conditions if the pilot so requests.

If the pilot requests an update to a previous briefing, the specialist will ask for, or the pilot will provide, the time the previous briefing was received and other appropriate background material. The specialist will limit the update information, to the extent possible, to appreciable changes in the meteorological and aeronautical conditions since the previous briefing.

As with the other pre-flight briefings, specialists will provide a VNR recommendation

when, in the specialist's judgment, conditions would make VFR flight doubtful.

16. While obtaining a pre-flight briefing, pilots anticipating a VFR flight will file with the specialist a VFR flight plan. This filing is usually done orally. The flight plan contains information such as the pilot's name, telephone number, aircraft identification number, type, airspeed, departure airport and time, altitude of flight, route of flight, destination, estimated time en route, and remarks. The FSS specialist (usually at the Pre-flight Position) receiving this information from the pilot completes and records the information on an FAA flight plan form (Form 7233–1). After it is completed, the flight plan form is forwarded to the Inflight Position in the FSS where it is placed in a "suspense file" until the pilot radios the Inflight Position to "open" the flight plan upon his departure. After the pilot "opens" the flight plan, the FSS specialist records the departure time on the flight plan form, and then forwards the flight plan form to the Flight Data Position. Using the information on the flight plan form, the FSS specialist (usually at the Flight Data Position) then sends a "flight notification message" to the destination airport, informing the FSS specialist at or near the destination airport of the aircraft identification number, aircraft type, destination, estimated time of arrival and remarks.

17. Under certain circumstances, FSS specialists and air traffic controllers are required to solicit pilot reports ("PIREP's"), at least one per hour, if possible, to obtain information on significant weather phenomena such as thunderstorms, tornadoes, hail, icing, whiteouts, turbulence and wind sheer that would not ordinarily be known by the pilot through other means. When giving PIREP's, pilots state their position and altitude in order to provide relevancy to other pilots.

18. The FSM also describes an FSS specialist's duties during an in-flight "Routine Radio Contact." The rules applicable to such radio contacts are more fully described in Finding of Fact No. 78, *infra*.

## II. FIRST CONTACT: FEBRUARY 4, 1988 AT 1:04 P.M. (MST) (OUTLOOK BRIEFING)

19. Pilot Charlesworth first called the FSS at Cedar City, Utah, on February 4, 1988, at 1:04 p.m. The call was taken by FSS Specialist James O. Walstad. The pilot introduced himself and stated that he wanted a "general outlook of what it's gunna be like." *See* Appendix A, at 2004:38.

20. Since this first contact occurred well over six hours before the planned flight, the briefing constituted an outlook briefing. The pilot originally planned on leaving Salt Lake City on February 5, 1988, at about 5:30 a.m. MST. The time of departure of this proposed flight was beyond the valid time of much but not all of the forecast material available at the time of the call. The Area Forecast in effect at the time of the contact would expire at 11:00 p.m. on February 4, and the Terminal Forecast would expire at 12:00 noon on February 5.

21. The Terminal Forecast extended to the time the pilot originally planned to arrive in Roswell, 12:00 noon on February 5.[1] However, it did not extend to the time the plane actually arrived in Roswell. Due to the fog and haze conditions which were forecast for Salt Lake City in the early morning of February 5, Specialist Walstad advised the pilot to delay the flight until later in the morning.

22. This particular briefing was regarded by Specialist Walstad as a general outlook briefing, given beyond the valid time of the available forecast material, and governed by FSM ¶ 3–12b:

> When the proposed flight is scheduled to be conducted beyond the valid time of the available forecast material, provide a general outlook and then advise the pilot when complete forecast data will be available for the proposed flight. Upon request, transfer the call to, or furnish the telephone number of the appropriate NWS office.

FSM ¶ 3–12b.

23. Specialist Walstad apparently proceeded on the assumption that Pilot Charles-

---

1. If the original departure time of 5:30 a.m. on February 5, 1988, had been feasible, the plane may have arrived in Roswell before 12:00 noon, when the terminal forecast available to FSS Walstad was still valid.

worth would follow his advice to delay departing from Salt Lake City as planned at 5:30 a.m. He therefore did not give to the pilot the Roswell Terminal Forecast information then in his possession.

24. Specialist Walstad gave the pilot a "general outlook" and told the pilot to call back the next morning for more information. Walstad relied on WSI charts, the Salt Lake City Terminal Forecast, and the Salt Lake City Area Forecast, which expired on 11:00 p.m. that same day (February 4). He had available to him the Roswell Terminal Forecast, expiring at 12:00 noon on February 5, but did not use it. Specialist Walstad did not provide the pilot with current weather conditions, and the pilot did not ask for them. The pilot did not ask for the telephone number of the NWS office.

25. Specialist Walstad informed the pilot that a high pressure system would move over the Rockies during the night affecting all routes to the southeast, including the Roswell area, and stated that "during the day time [tomorrow], they are forecast unlimited VFR along that route and at the destination," and added that "it looks as [a] general idea the later in the day you start the better the weather will be for ya." *See* Appendix A, at 2005:34–2005:57. Finally, Walstad informed the pilot that "it looks good looks very flyable but you'll have to check in the morning for more detail." *Id.* at 2006:30.

26. With regard to the weather in Salt Lake City and the route of flight up to the area immediately surrounding Roswell, Walstad's "general outlook" forecast was accurate based upon the materials Walstad relied upon and actual weather conditions up to 12:00 noon on February 5. As to the immediate Roswell area, the weather charts and forecasts used by Walstad did not predict to the fullest extent the severe weather conditions which actually existed on the afternoon of February 5, 1988. The NWS weather charts used by Walstad did predict VFR weather en route to Roswell and MVFR to VFR weather in Roswell during the mid-afternoon of February 5.

27. The current conditions at the Roswell Airport during the 1:04 p.m. contact in fact were IFR. The sky at Roswell was 100%

overcast and 100% obscured. Because of snow showers, ground fog, and clouds, the surface visibility was one-half mile. These conditions did not change, in any substantial way, over the next twenty-four hours.

## III. SECOND CONTACT: FEBRUARY 5, 1988 AT 4:33 A.M. (MST) (COMPUTER DOWN—INCOMPLETE BRIEFING)

28. Pilot Charlesworth called the Cedar City FSS back at 4:33 a.m. on February 5 and requested a standard weather briefing for the flight from Salt Lake City to Roswell. Specialist Walstad answered the phone. The station's computerized weather information system was down, and had been inoperable for most of the night. Without access to the information in the computer, Walstad was unable to provide the pilot with a standard weather briefing.

29. The FSM directs the FSS specialist to take the following steps when the specialist is unable to obtain information from the weather computer: (1) inform the pilot of the problem; (2) brief the pilot to the extent possible; and (3) as appropriate, provide the pilot with the telephone number of another FSS, a NWS office, or advise the pilot of the time the data is expected to be available. FSM ¶ 3–5.

30. Walstad informed the pilot several times during this contact that the computer system was down, and that without it he could not provide the pilot with a full weather briefing.

31. Pilot Charlesworth acknowledged this fact and told Walstad that he had called the FSS the day before and had received "a pretty good brief." *See* Appendix B, at 1136:40–1136:43.

32. After informing the pilot of the problem, Walstad told the pilot that he could only provide him with "a very general weather brief but not the current weather along that route." *Id.* at 1134:26. Walstad further informed the pilot that he would have to work from a weather depiction chart which he had received at about 3:00 a.m., an hour and a half before the contact. Weather depiction charts are "snapshots" of the weather and do

not include forecasted weather. Further, they do not include surface weather observations from Roswell.

33. Based on the weather depiction charts, Walstad told the pilot that Salt Lake City would be experiencing fog and haze and low visibilities until 10:00 a.m., after which it would see visibilities in excess of five miles. Because of "a little pocket of fog and haze" between Grand Junction, Colorado, and Farmington, New Mexico, Walstad advised the pilot to "drop down to central Arizona and then straight east to Roswell," and that he should "check the weather as you go along and see just how far you can go." Appendix B at 1134:34. Specialist Walstad also said that the Farmington area would see greater than five miles horizontal visibility after 1:00 p.m. *Id.* at 1134:34.

34. Based on the weather depiction charts he was using, Walstad indicated that Roswell was experiencing some inclement weather. He reported that "they do have some fog conditions in the Roswell area but not in Albuquerque or Santa Fe so you can check the weather as you go along and see just how far you can go." *Id.* at 1134:34. He explained that the forecast for the Roswell area "says slow but steady improvement all day visibility five [miles] or greater by noon...." *Id.*

35. Notwithstanding the fact that he had been advised the day before not to leave until later in the morning, Pilot Charlesworth reported that he planned on leaving Salt Lake City at 5:30 a.m. Walstad advised the pilot, as he had the day before, that "you don't want to leave at the crack uh dawn but you can leave late morning and it will look good fairly much all the way across." *Id.* at 1135:55.

36. Walstad's weather brief was limited to "very general" information. The forecast as presented neither painted a "rosy" picture of the Roswell forecast nor did it indicate the severity of the weather which actually existed in Roswell on February 5. .

37. If Specialist Walstad had access to the current area and terminal forecasts he would have received the following forecast information and presumably would have made such available to Pilot Charlesworth: the Area Forecast in effect at the time of the contact called for Marginal VFR weather in Southeastern New Mexico until 3:00 p.m. on the 5th; the Roswell Terminal Forecast predicted VFR conditions at 3:00 p.m. the actual time of the plane's arrival in Roswell, but IFR conditions before that time; the NWS prognostic charts predicted VFR weather conditions en route to Roswell, and Marginal VFR or VFR conditions at Roswell for the afternoon of the 5th.

38. The actual weather in the Roswell area on February 5 did not fully comport with the weather depiction charts, or with official NWS forecasts. Indeed, IFR conditions, with the accompanying snow and fog so dangerous to VFR pilots, prevailed for most of the day on the 5th.

39. Because the computer system was down, Specialist Walstad was not able to provide current Roswell conditions. At the time of the 4:33 a.m. contact, Roswell was experiencing an unseasonably severe snow storm. There was approximately ten inches of snow on the ground, the temperature was below freezing, the sky was 100% overcast and 100% obscured, and the horizontal visibility at the Roswell airport was one-half mile. At trial, Walstad testified that if he had been able to access the current Roswell conditions on the computer, he would have given the pilot a VNR advisory.

40. Notwithstanding the procedures set forth in FSM ¶ 3–5, Walstad did not furnish Charlesworth with the number of another FSS, or the number of an NWS office. Specialist Walstad did not know when the weather data would be available at the Cedar City FSS.

41. In addition to obtaining this general weather brief, the pilot took the opportunity to file his VFR flight plan. The pilot provided his name, and set forth his planned route of flight, including a fuel stop in Farmington. Specialist Walstad again informed him of possible fog in Farmington, and the pilot responded that if he could not make it to Farmington, his alternative refueling stop would be Albuquerque. Walstad acknowledged the change, and instructed the pilot to call after he was airborne to open his flight

plan, and to provide PIREP's during the flight. *See* Appendix B, at 1136:30–1139:52.

42. In accordance with FAA procedure, Walstad completed the flight plan form (FAA Form 7233–1) with the information he received from the pilot. The FSM gives the following instruction to FSS specialists with regard to filling out a Form 7233–1 after a pre-flight briefing:

Check the "pilot briefing" block, fill in "specialist initials" and "time started." As applicable, enter "AB" (Abbreviated Briefing), "OTLK" (Outlook Briefing), and/or check the "VNR" block ["VFR not recommended" advisory].

FSM § 3–7b. Walstad checked the "pilot briefing" block, but did not give any indication of what type of briefing he had provided the pilot. Plaintiffs argue that in lieu of entering "AB" for abbreviated briefing, or "OTLK" for outlook briefing, neither of which was applicable to this contact, Walstad should have entered "IC" for incomplete briefing, or otherwise should have given some indication on the form that the pilot had not been given complete information. Plaintiffs' argument is supported by the testimony of FSS Specialist Merlin C. Mackay. Mackay testified that if he had filled out the flight plan form, he would have indicated on the form, by marking "I.C." or by some other method, that he had not been able to give the pilot complete weather information.

## IV. TRANSFER OF RESPONSIBILITY AT THE CEDAR CITY FSS.

43. FSS specialists have a procedure to transfer responsibility for their particular position when they are relieved by another specialist so as to ensure that pertinent information is passed on from shift to shift. FSM ¶ 1–33a. The FAA procedure does not require a specialist coming off his or her shift to brief all relieving specialists, but only requires the relieved specialist to brief his or her replacement. The computer outage is the type of information which should have been passed on to a relieving specialist. FSM ¶ 1–33f(2)(a).

44. Neither Specialist Poulson nor Specialist Mackay relieved Specialist Walstad on the morning of February 5. However, neither Poulson nor Mackay were informed of the computer problems the night before. Accordingly, Poulson and Mackay did not know that pilots had been receiving incomplete weather briefings during the night preceding their shifts.

45. Each FSS is required to use and review Form 7230–4, Daily Record of Operation. The purpose of this form is to record and describe significant conditions within the facility. The extended inability to access important weather information is a significant condition. The computer outage on the night of February 4 and the early morning of February 5 was not recorded on the Cedar City FSS's Form 7230–4. The responsibility for this task is usually that of the controller-in-charge. Had this information been included on Form 7230–4, later shifts of Cedar City FSS specialists would have been aware that pilots had been receiving incomplete weather briefings during the night.

## V. THIRD CONTACT: FEBRUARY 5, 1988 AT 7:17 A.M. (MST) (ABBREVIATED BRIEFING—CHARACTERIZED AS AN UPDATE BRIEFING)

46. Pilot Charlesworth called the FSS at Cedar City for a third time, at 7:17 a.m. on February 5, and talked with FSS Specialist Burton C. Poulson. Pilot Charlesworth said, "I need to get a weather briefing uh for this morning Salt Lake International to uh Roswell New Mexico." Appendix C, at 1417:52.

47. Apparently, Specialist Poulson was not sure exactly what type of weather briefing the pilot requested. Under such circumstances, the FSM gives the following instruction:

When it is not clear initially which type briefing is desired, provide the first one or two items requested, and then ask the pilot, "Would you like a standard briefing?" If a standard briefing is requested, conduct the briefing in accordance with ¶ 3–10. If the pilot does not desire a standard briefing conduct the briefing in accordance with ¶ 3–11 [abbreviated briefing] or ¶ 3–12 [outlook briefing].

FSM ¶ 3–6.

48. Poulson followed the procedure outlined in FSM ¶ 3–6. He first told the pilot

that VFR was not recommended from Salt Lake. Second, he asked the pilot if he wanted a full briefing: "let me get ya the rest of the weather if you'd like. . . . what time were ya planin on leaven?" Appendix C, at 1418:11.

49. Pilot Charlesworth responded as follows:

Well uh I called earlier today and I got flight uh briefing and they said that as soon as we got out ah Salt Lake Valley that it be ya know quite nice flying but we're sitten out here at the airport just wondering how much longer you anticipate to be fogged in.

*Id.* at 1418:36.

50. Specialist Poulson responded to the pilot's request as follows:

Ok uh uh your right after you get out of Salt Lake looks like pretty good uh well actually south of Provo looks like pretty good uh weather just some scattered clouds or clear skies most for most of the area and uh lets see the terminal forecast for Salt Lake City calling for uh from now up until uh eighteen hundred zulu which would be eleven o clock this morning calling for sky partially obscured ceilings six hundred broken one mile fog and smoke occasional sky partially obscured two miles fog and smoke with a chance ceiling three hundred sky obscured one half of a mile light snow fog and smoke and then after eighteen hundred zulu uh improving to sky partially obscured three miles fog and smoke and uh it should remain that way the rest of the day so . . . [i]t would be eleven o clock uh improving or still marginal VFR but it'll but be above IFR minima anyway.

Appendix C, at 1418:52–1419:57.

51. At this time, Pilot Charlesworth knew or should have known that he had not yet received a full weather briefing but had received only general, incomplete weather information.

52. The records available to Poulson about the flight in question did not indicate that the pilot had not received a full weather briefing or that he had received only incomplete information.

53. The pilot's request reasonably could have been interpreted either as an abbreviated briefing for specific information, or as an abbreviated briefing for update information, or both. Specialist Poulson testified at trial that he interpreted the pilot's request as one for an abbreviated briefing for specific information, specifically the weather at the Salt Lake Airport. However, Specialist Poulson also apparently regarded the request as calling for an update briefing because that is how he characterized the briefing on the flight plan form (FAA Form 7233–1). A review of the pilot's request, Specialist Poulson's response, and the Form 7233–1 indicates that Poulson interpreted the pilot's request as one for specific information, as well as one for update information.

54. During an abbreviated briefing for specific information, FSS specialists are instructed to respond to the pilot's question and inform the pilot of the existence of any adverse conditions. FSM ¶ 3–11a. Details of these adverse conditions are to be given at the pilot's request. *Id.* Poulson responded fully to the pilot's question regarding when he could leave Salt Lake City. Poulson also informed the pilot of the existence of adverse conditions in the Salt Lake Valley.

55. During an abbreviated briefing for update information, FSS specialists are instructed to obtain from the pilot the time of the previous briefing and other background information. FSM ¶ 3–11b. After obtaining this information, the FSS specialist is then instructed to limit the briefing, to the extent possible, to appreciable changes in meteorological and aeronautical conditions since the previous briefing. *Id.*

56. During an abbreviated briefing for update information, pilots are instructed to provide the briefer with necessary background information, the time of the previous briefing, and the source of the previous briefing. AIM ¶ 502c.

57. Specialist Poulson failed to obtain, and the pilot failed to provide, adequate background information, the time of the previous briefing, and the source of the previous briefing. As a result, Poulson did not know that the pilot's previous briefing was incom-

plete due to the failure of the weather computer.

58. Poulson provided the pilot with the following update information as to the weather along the route of flight:

OK uh uh your right after you get out of Salt Lake looks like pretty good uh well actually south of Provo looks like pretty good uh weather just some scattered clouds or clear skies most for most of the area....

*Id.* at 1418:52.

59. The forecast information available to Poulson at 7:17 a.m. called for VFR conditions in the Roswell area by mid-afternoon on February 5. The Area Forecast for Southeastern New Mexico called for IFR conditions becoming VFR around 2:00 p.m. The Roswell Terminal Forecast called for VFR weather during mid-afternoon. The NWS Prognostic Charts called for VFR weather en route, and MVFR to VFR weather in the Roswell area.

60. Poulson's update information was generally accurate with regard to the route of flight up to the immediate Roswell area. However, with regard to the immediate Roswell area, Poulson's update information failed to sufficiently apprise the pilot of the meteorological and aeronautical conditions which the pilot had not received during the 4:33 a.m. contact.

61. After completing the 7:17 a.m. contact, Specialist Poulson indicated on the flight plan form (FAA Form 7233–1) that he had given the pilot an "update" briefing. In so doing, Poulson passed on to the FSS specialist who relieved him that he had provided an "update" briefing to the pilot, thus certifying that he had inquired as to the time the previous briefing had been received, that other appropriate background material had been inquired into, and that he had advised the pilot of changes in meteorological and aeronautical conditions including those en route to Roswell and at the Roswell airport.

62. In addition, Poulson failed to check the VNR block on the Form 7233–1. FSM ¶ 3–7b.

63. Specialist Poulson did not provide the pilot with current Roswell conditions, and the pilot did not ask for them. The current conditions in Roswell at the time of the 7:17 a.m. contact were IFR. In fact, the Roswell Airport was closed, and had been closed for more than two hours. The sky was 100% obscured because of clouds, fog, and snow and the prevailing visibility at the airport was less than one-half mile.

64. Approximately one hour later, at about 8:30 a.m., the pilot and his two passengers took off from the Salt Lake Airport. The court assumes that the pilot received a Special VFR clearance to take off from Salt Lake as IFR conditions existed at the airport at that time. Air traffic control tapes evidencing that clearance were placed back into service, and the conversation containing the assumed Special VFR clearance was taped over.

65. When the pilot left the Salt Lake Airport, he knew or should have known that he had not yet adequately apprised himself of crucial weather information pertaining to the flight to Roswell, including the Area Forecast, the Roswell Terminal Forecast, the current Roswell weather, and pertinent airport condition information (i.e. NOTAM's).

VI. FOURTH CONTACT: FEBRUARY 5, 1988 AT 8:41 A.M. (MST) (IN FLIGHT—NO WEATHER BRIEFING)

66. At 8:41 a.m. Pilot Charlesworth used the radio in his aircraft to contact the Cedar City FSS for the fourth time. He spoke to FSS Specialist Merlin C. Mackay. Charlesworth identified his airplane, opened his flight plan and changed his anticipated time en route from five to seven hours. Mackay confirmed the change in the flight plan with respect to the anticipated time en route, and entered 3:41 p.m. as the estimated time of arrival at Roswell. Pilot Charlesworth did not take the opportunity during this contact with Specialist Mackay to request a full weather briefing, or any specific weather or aeronautical information pertaining to his route of flight.

67. The Roswell Airport was closed at 8:41 a.m., and had been closed for three and one-half hours. The sky was 100% overcast,

the prevailing visibility was one-quarter mile, and it was snowing. This information was not provided to pilot Charlesworth. Specialist Mackay had access to the flight plan form which indicated that about an hour and one half prior to the current contact the pilot had received an update briefing.

68. Specialist Mackay did not know from the flight plan form, or from any other FSS source, or from the pilot that the pilot had not yet received an adequate weather briefing. Specialist Mackay was not aware that the computer at Cedar City had been down. If he had known that the pilot had received only incomplete weather information, the applicable provisions of the FSM would have required that he provide the pilot with updated and complete weather information. FSM ¶ 4–3a; AIM ¶ 295d. The records available to him indicated that the pilot had been supplied with the changing weather and other information to update previous briefings the pilot had received.

69. Specialist Mackay attempted to call the pilot back after the contact to find out whether the pilot was planning on making a full stop in Farmington. He was unable to reestablish contact.

## VII. LANDING AT ALBUQUERQUE, NEW MEXICO: FEBRUARY 5, 1988 AT ABOUT 1:00 P.M.

70. Pilot Charlesworth chose to refuel in Albuquerque instead of Farmington. He contacted Albuquerque Approach control for vectors to a landing, and was vectored to the Coronado Airport, an alternate airport about nine miles north of Albuquerque. The plane landed at about 1:00 p.m. in clear skies and with no indication of hostile weather.

71. The tape containing the dialogue between the pilot and the controller who vectored him to the Coronado Airport is unavailable because it was put back into service and taped over.

72. After landing, the plane was refueled. Pilot Charlesworth was having difficulty understanding incoming messages in the cabin because of radio problems. While on the

ground, Charlesworth had the cabin speaker checked. It was found to be defective and was replaced by a company called TBC Avionics.

73. While on the ground, the pilot telephoned the plane's owner, Larry Wright, to obtain his permission to have the cabin speaker fixed. During that conversation, Mr. Wright warned Charlesworth that he had heard that there was a weather system in southern New Mexico and that Charlesworth should check the weather for his flight. Charlesworth stated that he would do so. There is no record to show whether or not Pilot Charlesworth checked the weather before he departed from the Coronado Airport.

74. The plane departed Coronado Airport at about 1:30 p.m., and was in radio contact with the Albuquerque Air Route Traffic Control Center, which vectored the pilot toward Roswell, New Mexico, on and off, from about 1:30 p.m., to 1:53 p.m. The tape containing the dialogue between the pilot and the controller who vectored him toward Roswell is unavailable because it was put back into service and taped over.

## VIII. FIFTH CONTACT: FEBRUARY 5, 1988 AT 2:31 P.M. (MST). (ROSWELL WEATHER REPORT—VFR CONDITIONS)

75. At 2:31 p.m., while in flight from Albuquerque to Roswell, Pilot Charlesworth contacted the Roswell FSS. The pilot spoke to FSS Specialist Berrier D. Byrom, a certificated weather observer.

76. Pilot Charlesworth requested the current Roswell weather. In response to the pilot's request, Specialist Byrom provided the following weather observation, which had been taken at 1:48 p.m., and was effective until 2:48 p.m.:

> Measured ceiling 1,000 feet variable overcast visibility 5 miles; fog; temperature 33 degrees F; dew point 28 degrees F; wind 100 degrees at 5 knots; altimeter setting 30.43 inches of mercury. Remarks: Ceiling 500 feet, variable 1,400 feet.[2]

2. The Roswell FSS does not have recording equipment so there is no transcript evidencing

the conversation between the pilot and Specialist Byrom. The only evidence before the court of

77. Pilot Charlesworth asked if these conditions were "[g]ood enough for a special VFR into Roswell." Appendix D. Specialist Byrom responded that the weather was VFR. He then instructed the pilot to contact the Roswell Approach Control on a different radio frequency. Charlesworth acknowledged, and the contact was terminated.

78. By making this contact, pilot Charlesworth had initiated a "Routine Radio Contact" which required Specialist Byrom to comply with the following procedures set forth in the Flight Service Manual (FSM):

"Record information received from or given to the pilot. Provide aeronautical and meteorological information in accordance with paragraph 4–3." FSM ¶ 4–14.

Paragraph 4–3 instructs FSS specialists, in pertinent part, to

a. Provide the pilot with available meteorological and aeronautical information in accordance with paragraph 3–10 [standard briefings], 3–11 [abbreviated briefings], and 3–12 [outlook briefings] as appropriate.

b. Provide information during routine radio contacts as follows:

(1) When a weather advisory is in effect; i.e., FA Flight Precautions, WA, WS, WST, CWA or AWW, which pertains to an area within 150 NM miles of the aircraft's position, obtain the route and destination if not already known. Deliver the advisory if it is pertinent and the pilot indicates that it has not been received previously.

(2) When the destination is in your stations flight plan area, inform the pilot of any pertinent NOTAM's on hand.

FSM ¶ 4–3.

79. Pilot Charlesworth asked for specific information (i.e. the current Roswell weather). When a pilot requests specific information, FSM ¶ 4–3a instructs a FSS specialist to treat the request as one for an abbreviated briefing for specific information under ¶ 3–11a. Paragraph 3–11a instructs the FSS specialist to provide the requested information, and to give notice of the existence of pertinent adverse conditions, present or fore-

cast. Details of any adverse conditions are provided at the pilot's request.

80. Specialist Byrom provided the pilot with accurate current Roswell weather, obtained through the 1:48 p.m. surface weather observation, which was valid through 2:48 p.m.

81. Byrom did not provide the pilot with information concerning the existence of adverse conditions, present or forecast, outside of those implied through the reading of the surface weather observation itself. In addition, Specialist Byrom failed to warn the pilot of possible whiteout danger. See infra Findings of Fact Nos. 119–122. Under the conditions which existed at the time of the 2:31 p.m. contact, the danger of experiencing a whiteout phenomenon near the Roswell Airport was foreseeable to Specialist Byrom. He knew of the possibility of low cloud ceilings, of the unbroken layer of snow on the ground, and of the rural nature of the Roswell area. Notwithstanding this knowledge, Byrom failed to inform the pilot of the danger.

82. During Routine Radio Contacts, FSS specialists are instructed to provide weather advisory information to pilots if the particular weather advisory pertains to an area within 150 miles of the plane's position. Weather advisories include AIRMET's (WA), SIGMET's (WS), Convective SIGMET's (WST), Center Weather Advisories (CWA), or Severe Weather Forecast Alerts (AWW). FSM ¶ 4–3b(1).

83. Plaintiffs argued at trial that Byrom failed to provide the pilot with information concerning pertinent AIRMET's (WA). AIRMET's (WA) are weather advisories which pertain the following potentially hazardous weather phenomena: (1) Moderate icing; (2) Moderate turbulence; (3) Sustained winds of 30 knots or more at the surface; (4) Widespread area of ceilings less than 1,000 feet and/or visibility less than three miles; and (5) Extensive mountain obscurement. AIM ¶ 504g. If the weather conditions which would normally be included in a particular AIRMET are adequately found in the Area Forecast, the AIRMET

this conversation is Byrom's Personnel Statement. See Appendix D.

will not be issued. AIM ¶ 504g. Specialist Byrom supplied no AIRMET's (WA) to pilot Charlesworth, but plaintiffs failed to provide sufficient evidence to sustain their burden of proof that any AIRMET existed at the time of the contact.

84. During Routine Radio Contacts, FSS specialists are instructed to provide the pilot with relevant NOTAM's. FSM ¶ 4–3b(2). Specialist Byrom failed to supply pilot Charlesworth with any relevant NOTAM's dealing with the conditions at the Roswell airport. Such NOTAM's would have informed the pilot that there was a great deal of snow on the ground at the airport. In fact, only one out of six of the runways and two out of ten of the taxiways remained open. The NOTAM's would have informed the pilot how much the airport personnel had been able to plow the available runway and taxiways. In addition, the NOTAM's would have informed pilot Charlesworth that the snow on the side of the runway was 28 inches high.

85. FSS specialists are instructed to actively solicit Pilot Reports ("PIREP's") when, among other things, cloud ceilings are at or below 5,000 feet. FSM ¶ 9–11. Cloud ceilings were well below 5,000 feet at the time of the radio contact between the pilot and Specialist Byrom. PIREP's are used by FSS specialists and other ground advisory personnel to obtain weather information which may be observable to the pilot, but not to the specialist. This information is later passed on to other pilots in the same area to better prepare them for weather conditions in their path. PIREP's are limited in their geographic and chronological scope. They are only good for about an hour, and are only helpful with regard to the specific location from which the PIREP was gathered.

86. Specialist Byrom failed to solicit PIREP's from, or disseminate PIREP's to, Pilot Charlesworth. There were only 36 flights at Roswell Airport on February 5. Since the airport was closed until 11:30 a.m., almost all of those flights that day came after 3:00 p.m., the approximate time of the crash. Due to the unusually light air traffic going through Roswell on February 5, it is unlikely that there were any pilots flying through that area, within an hour prior to Pilot Charles-

worth's arrival, from which Byrom could have obtained PIREP's. Plaintiffs failed to sustain their burden of proof that PIREP's existed at the time which could have been passed along by Specialist Byrom.

87. The data contained in the 1:48 p.m. surface weather observation—"Measured ceiling 1,000 feet variable overcast visibility 5 miles. . . . Remarks: Ceiling 500 feet, variable 1,400 feet"—were reported to pilot Charlesworth by Specialist Byrom as constituting VFR weather conditions. The report that this constituted VFR weather, rather than IFR weather, was correct based upon the following:

a. The minimum weather requirements for legal VFR flight inside the control zone are (1) a ceiling height of at least 1000 feet; and (2) horizontal visibility of at least three miles. 14 C.F.R. § 91.155(c) & (d).

b. The "ceiling" for purposes of making the IFR/VFR distinction is the lesser of (1) the height of the lowest opaque broken or overcast layer aloft, or (2) the vertical visibility into a surface-based layer of obscuring phenomena that hides the entire sky." Federal Meteorological Handbook No. 9, *Aviation Weather Observations* ¶ 2.21 ("FMH No. 9").

c. The ceiling or "ceiling height" reported in the 1:48 p.m. surface weather observation, and used to make the IFR/VFR distinction, was obtained by taking readings with a device known as a "ceilometer." Weather observers arrive at the ceiling height by taking the average of all observed readings from the ceilometer during the period of observation. *Id.* ¶ 3.10.

d. The established ceiling height in a weather observation is preceded by a "ceiling designator." *Id.* at ¶ 4.2. The ceiling designator indicates to the person relaying the observation, and to the pilot receiving the observation, the level of accuracy of the method used to determine the ceiling. *Id.* ¶ 2.23. There are three ceiling designators: Measured ceiling (M); Estimated ceiling (E); and Obscured ceiling (W). *Id.* at ¶ 2.23. A ceiling height determined through use of a ceilometer, an accurate method of determining the ceiling height, is preceded by the

ceiling designator "M" for "measured ceiling." *Id.* at 3.7a. The ceiling height in the 1:48 p.m. weather observation was 1,000 feet, preceded by the ceiling designator "M" for "measured ceiling."

e. If the ceiling height is below 3,000 feet, then the weather observer is required to place a "V" for "variable" after the ceiling height. This indicates to the person providing the information, and to the pilot receiving it, that the ceilings varied during the time the ceiling height was being determined. The observer then indicates the amount the ceiling fluctuated, in the "Remarks" section of the observation. *Id.* at 3.10. "V" for "variable ceiling" is not a ceiling designator. *Id.* It provides the pilot information concerning ceiling fluctuation, but it is not used to determine ceiling height for purposes of distinguishing VFR conditions from IFR conditions.

88. While the conditions reflected in the 1:48 p.m. weather observation technically were VFR, those conditions bordered on VFR minimums, and the cloud ceilings were fluctuating rapidly. This constituted marginal VFR weather. FSS specialists are instructed to give the pilot a VNR recommendation ("VFR not recommended") if conditions are present that, in the specialist's judgment, would make VFR flight doubtful. FSM ¶ 3–10b(2); AIM ¶ 502b(2). Specialist Byrom did not give the pilot a VNR recommendation.

89. Pilot Charlesworth knew or should have known that the weather conditions reported to him (as reflected in the 1:48 p.m. weather observation) were potentially dangerous to a VFR pilot and his passengers even though the conditions were at the legal VFR minimums. Pilots are instructed to "learn to obtain, read, and understand aviation weather forecasts and reports." FAA *Flight Training Handbook*, at 116.

90. Because of the poor weather near the Roswell Airport on the afternoon of February 5, the Roswell FSS conducted a special surface weather observation which was issued at 2:36 p.m., approximately four minutes after the pilot contacted Specialist Byrom at 2:31 p.m. The 2:36 p.m. observation was still in the process of completion when

the pilot called at 2:31 p.m. The 2:36 p.m. observation provided,

> Measured ceiling 600 feet broken, 1600 feet overcast; visibility 5 miles; light snow showers and fog....

The measured ceiling had changed from 1,000 feet variable to 600 feet broken. The conditions had changed from VFR, or MVFR, to IFR. Specialist Byrom did not attempt to call the pilot back with this further information.

91. Specialist Byrom did provide the changed weather information which indicated IFR conditions to the Roswell Air Traffic Control Tower ("Roswell Tower"). The pilot had been instructed to contact the Roswell Tower for landing information.

92. At 2:44 p.m., after the 2:31 p.m. contact with Specialist Byrom, but before Pilot Charlesworth contacted the Roswell Tower, someone from the Roswell FSS, possibly Specialist Byrom, contacted the Roswell Tower and spoke to Air Traffic Controller Weldon R. Steen. The subject matter of the conversation concerned the best way to get through the snow from the FSS to the Tower. The parties to the conversation did not discuss Pilot Charlesworth. The tape of the 2:44 p.m. conversation was not furnished to the National Transportation Safety Board, was not included in the FAA's Traffic Accident Package, and was not initially furnished to Plaintiffs attorneys during discovery. It was pertinent only insofar as it revealed current observable weather conditions at the airport at that time. The conversation did not reveal any pertinent information which was not eventually given to the pilot.

IX. SIXTH AND FINAL CONTACT: FEBRUARY 5, 1988 AT 2:48 P.M. MST (CLEARANCE FOR SPECIAL VFR LANDING)

93. At 2:48 p.m., Pilot Charlesworth contacted the Roswell Tower. Air Traffic Controllers Charles Brown and Weldon R. Steen were on duty at that time. Controller Brown took the call from the pilot. Pilot Charlesworth reported that he was twenty-four miles north of the airport, flying at 9,500 feet, inbound for a VFR landing. *See* Appendix

E, at 2148:34. Controller Brown provided the pilot with the information contained in the 2:36 p.m. special surface weather observation, which indicated that the airport was experiencing IFR conditions.

94. After giving Pilot Charlesworth the weather report, Controller Brown asked Charlesworth, "[W]hat are your intentions?" *Id.* at 2148:48. Pilot Charlesworth replied, "Landing at Roswell full stop." *Id.* at 2149:11. Controller Brown told the pilot that "the field is IFR." *Id.* at 2149:15. After waiting several seconds with no response from the pilot, Brown repeated his statement that the airport was IFR. *Id.* at 2149:29.

95. Pilot Charlesworth acknowledged Controller Brown's statement, and said, "The field is IFR oh kay we are VFR can you ah direct us to another airport." *Id.* at 2149:34.[3] Controller Brown testified at trial that he was not able to clearly hear Pilot Charlesworth's request. The *Air Traffic Control Manual* ("ATCM"), which outlines controller duties, instructs controllers in these situations to use the standard phrases of "repeat," or "say again" when the controller has not been able to clearly understand a pilot's statement. ATCM ¶ 2–82. Defendant's Air Traffic Control expert Edmund Strong testified that the most important aspect of controller phraseology is to clearly articulate a message to the pilot. After several seconds, Brown said, "What are you requesting archer eight four seven one foxtrot?" *Id.* at 2149:43. This statement adequately put the pilot on notice that the tower had not been able to hear and/or understand his request to go to another airport.

96. Controller Brown was not wearing his headset when the pilot called. He was communicating with the pilot using the tower's speaker phone. Both Plaintiffs' and Defendant's air traffic control specialists testified that this was a normal, accepted, and reasonable practice during long periods of slow traffic. While it may have partially contrib-

uted to Brown's failure to hear the Pilot Charlesworth's request to be directed to another airport, the fact that Brown did not use his headset did not hinder, in any substantial way, communication between Pilot Charlesworth and the Roswell Tower.

97. In response to Controller Brown's query, "What are you requesting," Pilot Charlesworth apparently changed his request for directions to another airport and instead said, "We're requesting a special VFR landing." *Id.* at 2149:48.

98. When the pilot made the request for a Special VFR clearance, he was twenty-four miles northwest of the Roswell Airport, flying in clear skies, at 9500 feet, with sufficient gas to return to Albuquerque or to fly to several alternative airports in the area. Some of those alternative airports were then experiencing VFR conditions. At this time, the pilot knew or should have known, either from the reports he received, or from his own observations, that there was IFR weather in Roswell, including low cloud ceilings, light snow, fog, and horizontal visibilies reduced to five miles.

99. At the time of Pilot Charlesworth's request to the controller to grant a Special VFR clearance, the reported prevailing ground visibility was five miles.[4] Controller Brown granted Pilot Charlesworth's request for a Special VFR clearance into the control zone north of the Roswell Airport.

100. Controller Brown set the Special VFR altitude restriction, which would apply only within the control zone, "at or below [5,500 feet]." *Id.* at 2149:59. The pilot erroneously read the restriction back as "at or below [5,000] feet." *Id.* at 2150:15. Controller Brown did not correct this erroneous readback. The ATCM instructs controllers to correct incorrect or incomplete readbacks, "as appropriate." ATCM ¶ 2–72b. Pilot Charlesworth's readback was in compliance

---

**3.** As was explained above in Finding of Fact No. 9, it is illegal for a VFR flight to land in IFR conditions without first obtaining a special VFR clearance.

**4.** In order for a controller to grant a Special VFR clearance, the reported prevailing ground visibil-

ity inside the control zone must be at least one statute mile. 14 C.F.R. § 91.157(d); ATCM ¶ 7–46. At the time of Pilot Charlesworth's request, the reported prevailing ground visibility was five miles.

with the altitude restriction given him, and did not compromise safety.

101. At 2:52 p.m., Controller Brown contacted the pilot and gave him the airport NOTAM's. He told the pilot that 7,100 feet of runway 21 was open, that 5,000 feet of that runway was plowed 100 feet wide, and that the snow banks on either side of the plowed runway were 28 inches high. Appendix E, at 2152:22.[5] Controller Brown testified that he did not give the pilot these NOTAM's when the pilot first called because the runways were in the process of being plowed. The ATCM instructs controllers to provide relevant NOTAM information "in time for it to be useful to the pilot." ATCM ¶ 3–32.

102. When the pilot received the NOTAM information, the plane was 17.9 miles northwest of the airport, flying at 6,000 feet, in clear skies, with sufficient fuel to return to Albuquerque or to fly to several alternative VFR airports in the area. Appendix E, at 2152:18–2152:45. At this time, based on his training, the reports he received from the Roswell Tower, and his own observations, the pilot knew or should have known that Roswell was experiencing low IFR cloud ceilings, light snow and fog, and that there was a great deal of snow on the ground. After receiving this information, the pilot had approximately ten minutes to make a decision whether to proceed or to turn around and fly to another airport.

103. Under the conditions which existed at the time the pilot received the Roswell Airport NOTAM's at 2:52 p.m., the danger of experiencing a whiteout phenomenon in the area was foreseeable to both Pilot Charlesworth, and Controller Brown. *See infra* Findings of Fact Nos. 119–122. Both knew that there were low cloud ceilings, that there was an unbroken layer of snow on the ground, and that the Roswell Airport was located in a relatively rural area. One important piece of information which Controller Brown knew, which most likely was not known by Pilot Charlesworth, had to do with

the relative lack of visual references on the airport side of Six Mile Hill. While the danger of whiteout existed on both sides of Six Mile Hill, the relative lack of visual references on the airport side increased that danger.

104. Controller Brown provided the pilot with the information contained in the 2:36 p.m. special surface weather observation, but took no independent visibility readings himself. Controllers are instructed to take their own independent visibility readings when the reported prevailing visibility at ground level or at the tower level drops below four miles. ATCM ¶ 2–105a. Prevailing visibility means that at least 50% of the 360 degree view from the weather observer has five miles of visibility. The reported prevailing visibility at the Roswell Airport was five miles at 2:36 p.m. Eight minutes after the accident, the prevailing visibility was over five miles. There is no indication that the visibility dropped significantly between these two readings.

105. A VOR is a navigational aide to pilots. Controller Brown did not inform the pilot, between 2:48 p.m. and the time of the accident, that individuals in the tower could not see the Roswell VOR. At the Roswell Airport, the VOR is located near the border of the control zone, on the northwest side of the airport. In addition to its use as a navigational aide, the Roswell VOR is used, in a secondary capacity, as the airport's five-mile visibility marker. This means that the weather observers in the Roswell FSS use this marker to help determine prevailing visibility for the airport. It is used for the same purpose by tower personnel when conditions require them to take their own visibility readings. The VOR is located approximately five miles from the Roswell FSS. It is located approximately six miles from the Roswell Tower.[6] The VOR is painted white because federal regulations require VOR's (in their primary capacity as navigational aides) to be painted a light color.

---

5. At 2:54 p.m., Controller Brown amended the NOTAM's and informed Pilot Charlesworth that the full plowed portion of runway 21 (7,100 feet) was plowed 100 feet wide. Appendix E, at 2154:23.

6. The Roswell FSS is located approximately one half mile from the Roswell Tower.

106. There is evidence that the actual visibility northwest of the tower may have actually been better at the time of the crash than the five miles that was reported in the 2:36 p.m. observation. At 3:08 p.m., shortly after the crash, Weldon Steen, the other controller in the tower, reported that "We got fairly good visibility. I think all the clouds are outside the marker." Appendix E, at 2208:46. The "marker" in this statement probably refers to the VOR, approximately six miles northwest of the tower.

107. Controller Brown did not inform the pilot that he could not see Six Mile Hill, or the airport's water tower. Six Mile Hill is located about eight miles from the Roswell Tower. The water tower is not an airport visibility marker, and Controller Brown testified that he did not try to use the tower to determine visibility.

108. Plaintiffs allege that Controller Brown failed to inform the pilot that he noticed lowering visibilities northwest of the VOR, the area of the crash. This allegation against Brown stems from the following statement in the FAA's Accident Investigation Report, written by Investigator Floyd A. Dockum: "A tower controller and witnesses reported to this inspector that the area NW of the VOR had reduced visibility, fog, and snow with seventeen inches of snow on the ground at the time of the accident." Mr. Dockum testified at trial that he was not certain whether the witnesses referred to in his written accident report talked directly to him, or whether he had obtained the information from interviews conducted by the National Transportation Safety Board's ("NTSB") Air Safety Investigator, Arnold W. Scott. Mr. Dockum also testified that the information contained in his report concerning the weather conditions at the specific crash site came from sheriff's deputies and witnesses at the Clubhouse Restaurant, and not from the controllers inside the Roswell Tower. That testimony contradicted Mr. Dockum's prior more contemporaneous statement that "a tower controller" as well as others had so reported, and the court finds that this information was reported to Mr. Dockum by a tower controller, either Controller Brown or Controller Weldon R. Steen,

both of whom likely were aware of the report, although neither would have known of its accuracy or inaccuracy.

109. Mr. Dockum explained that the tower controller in question provided him with the information contained in the 2:36 p.m. special surface weather observation (i.e. five miles visibility, light snow, fog.). Mr. Dockum testified that the term "reduced visibility" which was used but undefined in his accident report, was meant to describe the condition of five miles prevailing visibility, set forth in the 2:36 special surface weather observation, and not some lower figure.

110. The Clubhouse Restaurant is a building on the opposite side of Six Mile Hill from the airport. The witnesses in the Clubhouse Restaurant and the sheriff's deputies were all closer to the crash site than those inside the Roswell Tower.

111. Controller Brown testified that he never noticed reduced visibilities northwest of the VOR, and that he never told anyone otherwise. Considering the airport's reported prevailing visibility at the time (five miles), and the location of the crash site (about eight miles from the tower), it would have been unlikely for Controller Brown to have been able to see northwest of the VOR to the area of the crash.

112. The court finds that regardless of what Controller Brown was able to see or not see, and regardless of whether visibility in the area northwest of the VOR near the crash site in fact had reduced visibility, one of the Controllers at the tower had been informed that reduced visibility did exist in that area and most likely Controller Brown was aware of that report.

113. There were only thirty-six aircraft operations at the Roswell Airport the day of the crash, a particularly light day. Because the airport was closed during the morning, almost all of these operations occurred after 3:00 p.m., the approximate time of the crash. The ATCM instructs controllers during periods of light traffic to provide pilots with "additional services," primarily Radar, as their workload permits. ATCM ¶ 2–2b. "Additional services" is primarily a function of RADAR. The Roswell Tower is not

equipped with RADAR. The non–RADAR additional services were either included in the weather information provided the pilot, or were not applicable to the approach.

114. The weather conditions at the Roswell Airport mandated the active solicitation and dissemination of PIREP's by tower personnel. ATCM ¶ 2–102a. There is no evidence of Brown disseminating PIREP's to the pilot during his approach. Also, Brown did not solicit any PIREP's from the pilot.

115. Due to the unusually light air traffic going through Roswell on February 5, it is unlikely that there were any pilots flying through that area within an hour prior to Pilot Charlesworth's arrival, from which Brown could have obtained PIREP's. As to the failure to solicit PIREP's from the pilot, defendant's Air Traffic Control expert Edmund Strong testified that PIREP's are often taken from incoming pilots after they have landed so that the tower does not distract a pilot when he is trying to land his plane.

116. The pilot neither declared an emergency nor gave any indication that he was having difficulty flying his plane with the Special VFR clearance.

117. Since an emergency had not been declared Controller Brown was not required to maintain constant contact with the pilot. In this regard, Brown maintained adequate contact with the pilot from the time the pilot first contacted the tower at 2:48 p.m. until the plane crashed shortly after 3:00 p.m. The pilot contacted the tower at 2:48 p.m. and spoke with Brown for almost two minutes. Brown contacted the pilot again at 2:52 p.m. and gave him the current NOTAM's. The pilot contacted Brown at 2:53 p.m. to discuss details of the landing. Brown contacted the pilot again at 2:54 p.m. to give an update on the plowed runway. The pilot checked in again at 2:55 p.m. Brown contacted the pilot again at 2:59 p.m. to check his position. Brown attempted to contact the pilot at 3:03 p.m., about the time the pilot was supposed to be entering the control zone. There was no response.

118. After requesting and obtaining the Special VFR clearance at 2:49 p.m., the pilot dropped from 9,500 feet, where he was flying in clear sky, to 6,000 feet, where we assume he was also flying in clear sky, to 200 or 300 feet off the ground, below the solid ceiling of clouds. As a VFR pilot, Charlesworth was required to remain clear of clouds at all times. While it is unclear how Charlesworth was able to drop down to a couple of hundred feet off the ground without passing through clouds, the court assumes that Charlesworth was able to find holes in the cloud cover to make his descent.

119. After reaching its approach altitude below the cloud ceiling, the plane was observed by individuals standing on the deck of the Clubhouse Restaurant, which is located on the opposite side of Six Mile Hill from the Roswell Airport and the City of Roswell itself. These witnesses watched the plane for several miles. They testified that it was flying straight and steady at about 200 or 300 feet off of the ground, with approximately 3 or 4 miles of clear horizontal visibility. They watched the plane fly toward and over Six Mile Hill before they lost sight of it. Shortly after the plane crossed over to the airport side of Six Mile Hill, about eight miles from the Roswell Tower and about three miles from the border of the control zone, the pilot attempted to execute a 180° turn. That attempt was unsuccessful, and the plane crashed, killing its occupants.

120. There were no witnesses to the actual crash, and the pilot did not inform the tower of his reasons for entering the 180° turn. Plaintiffs' weather expert at trial, William Haggard, testified that the most reasonable explanation for the pilot's actions is that the pilot experienced a "whiteout" on the airport side of Six Mile Hill, lost visual reference, and attempted to turn around.

121. "Whiteout" is a term which describes an optical illusion, unique to the observer, which sometimes occurs when there are low cloud ceilings and an unbroken layer of snow on the ground. The whiteout phenomenon is not a forecasted weather condition. Nor can it be predicted with precision:

> Whiteout ... is an atmospheric optical phenomenon (often in polar regions) in which the observer appears to be engulfed in a uniformly white glow. Neither shad-

ows, horizon, nor clouds are discernable; sense of depth and orientation is lost; dark objects (if present) in the field appear to "float" at an indeterminable distance.

Whiteout occurs over an unbroken snow cover and beneath a uniformly overcast sky, when, with the aid of the snow blink effect [a bright, white glare on the underside of clouds, produced by the reflection of light from a snow-covered surface], the light from the sky is about equal to that from the snow surface.

This phenomenon is experienced from the air as well as on the ground.

R.E. Huschke, American Meteorological Society, Glossary of Meteorology (1986).

122. The conditions which existed around Six Mile Hill at the time of the crash lead the court to the conclusion that the pilot experienced whiteout and lost visual reference. It is likely that in addition to the low cloud ceiling and unbroken layer of snow on the ground, the "snow blink effect" was present from the perspective of the pilot. This caused the pilot to lose visual reference. The pilot crashed trying to escape his predicament.

123. Plaintiffs' weather expert William Haggard testified that whiteout was more likely to occur on the airport side of Six Mile Hill because of the relative lack of visual references in that area. There are some visual references on the Clubhouse Restaurant side of Six Mile Hill, including a few buildings and roads. However, the area on the airport side of Six Mile Hill is mostly open pasture and fences, with a relative lack of visual references. Such a lack of visual references would increase the likelihood that a pilot could experience this dangerous phenomenon in a rural area such as Roswell. Pilot Charlesworth most likely was not aware of the relative lack of visual references on the airport side of Six Mile Hill, compared with what he had been experiencing on the other side of Six Mile Hill. Neither Byrom nor Brown informed or warned the pilot of the relative lack of visual references on the airport side of Six Mile Hill. However, neither the Roswell Tower nor the Roswell FSS knew that they were dealing with a relatively inexperienced pilot. That information was known only by the pilot himself.

124. The parties' experts agreed at trial that if the pilot had lost visual reference, he would have had to rely solely on his instruments in making the turn. During the last 90° degrees of the turn, the terrain is dropping. Defendant's expert, Bernard Coogan, testified that an instrument guided 180° turn close to the ground is an extremely difficult aviation maneuver, and that inexperienced pilots tend to let the nose of the plane drop during the turn. It appears that this happened to Pilot Charlesworth. He found himself in an extremely difficult position, with no visual references, and unsuccessfully attempted to execute a difficult aviation maneuver.

X. SPOLIATION OF EVIDENCE

125. Plaintiffs allege that the Government unlawfully withheld and/or destroyed pertinent evidence in this case. Plaintiffs spoliation allegations concern several tower tapes, including the tape containing the 2:44 p.m. conversation between the Roswell Tower and the Roswell FSS, which was not furnished to the National Transportation Safety Board, was not included in the FAA's Traffic Accident Package, and was not initially furnished to Plaintiffs' attorneys during discovery. After reviewing the issue, the Court finds that the Government did not engage in unlawful spoliation of evidence activities with regard to tapes of tower communications.

126. Plaintiffs also allege that the Government intentionally and unlawfully withheld the investigation file of FAA Investigator Floyd A. Dockum ("the Dockum file") from discovery. Plaintiffs requested the file on several occasions during discovery but were told on numerous occasions that the file was not in the Government's possession, and that it had probably been destroyed. Mr. Baylen, one of the Government's attorneys in this case, discovered that the file still existed in December, 1992, at which time he obtained it and sent copies of its contents to Plaintiffs' attorneys. At a pretrial hearing held on February 22, 1993, this court made a finding, based on the evidence then before it, that the Government had committed spoliation of the

Dockum file. The court then ordered the Government to submit a memorandum explaining the chain of custody regarding the file, and why it had not been provided to the Plaintiffs earlier.

127. In furtherance of the court's order, the Government submitted a memorandum which included Mr. Dockum's declaration on the matter. In that declaration, Mr. Dockum explained that he created the file to assist the NTSB investigator on the crash site, Arnold W. Scott, in investigating the accident. Mr. Scott had the responsibility of gathering information for and creating the final NTSB accident report. Dockum explained in his declaration that, several months later, he received the final NTSB report, and determined that the report was consistent with the information he had prepared in the Dockum file. After making this determination, Dockum explained that the normal practice was to either destroy his own file, or send it to the NTSB. On this occasion, he neglected to do either, but rather kept it in his personnel file. After receiving a Freedom of Information Act ("FOIA") request for the file in January, 1991, Dockum discovered that he still had the file, forwarded the file to the regional FOIA office, and requested guidance. The FOIA request did not come from Plaintiffs' attorneys in this case, but came from attorneys involved in a state action concerning the plane's altimeter. From there, the file was sent to the NTSB, and was placed in the accident file at the Federal Records Center. After a diligent search on the part of the Government's attorneys at trial, Mr. Baylen and Mr. Marsh, the file was located in December, 1992, and was thereafter made available to the Plaintiffs. Plaintiffs further allege that their copies of the Dockum file were missing certain photographs which, according to Mr. Dockum, were originally placed in the file. The Government informed the court that it was continuing its attempt to locate these photographs. The Government's memorandum pointed out, however, that the subject matter of the alleged photographs in the Dockum file, were most likely adequately covered in the many photographs contained in the NTSB's accident record, which was made available to the Plaintiffs during discovery. Hence, the Government argues, even if there were photographs originally in Floyd Dockum's file, it is unlikely that Plaintiffs were adversely affected by not having those photographs at the time of trial. After reviewing the Government's explanatory memorandum, the Court reconsiders its initial finding of February 22, 1993, and concludes that while possibly careless, the Government's actions regarding the Dockum file did not constitute spoilation of evidence.

## XI. DAMAGES

128. The expenses for the trip to Roswell, New Mexico, were to be shared by the pilot, Alan R. Charlesworth, and his passengers, Lynn M. Webb and Richard A. Riding. The pilot leased the plane in his own name from Executive Aircraft International, Inc., and was going to be reimbursed by his passengers for the cost of the lease and for the fuel. He was not to be reimbursed for any repairs, or for his time expended in taking the trip, laying over, or flying the plane. Because the passengers were killed in the crash, before any payment occurred, the money for the lease of the plane was never paid.

129. Richard A. Riding paid for 40.1 gallons of aviation fuel, at the Coronado airport, and Alan R. Charlesworth, after obtaining his Lessor's consent to make the repair, paid for the replacement of the defective cockpit speaker. The pilot was to have been reimbursed by the Lessor of the plane, Executive Aircraft International, Inc., for the money spent on the cockpit speaker.

130. The Plaintiffs and their children were residents of the State of Utah at the time their claims were filed. They were born on the following dates, and had the following stated ages on February 5, 1988:

| Name | Dates of Birth | Age |
| --- | --- | --- |
| WEBB PLAINTIFFS: | | |
| Lynn Martineau Webb | May 5, 1957 | 30 |
| Jeannine Anderson Webb | October 1, 1955 | 33 |

| Name | Dates of Birth | Age |
| --- | --- | --- |
| Andrew Martineau Webb | November 24, 1981 | 6 |
| Laura Louise Webb | June 7, 1983 | 4 |
| Adam Lynn Webb | December 5, 1985 | 2 |
| Lydia Jeannine Webb | June 27, 1988 | 0 |
| RIDING PLAINTIFFS: | | |
| Richard A. Riding | March 17, 1960 | 27 |
| Monica Harris Riding | December 3, 1960 | 27 |
| Felicity Dawn Riding | July 17, 1982 | 5 |
| Danielle Elaine Riding | September 16, 1985 | 2 |
| CHARLESWORTH PLAINTIFFS: | | |
| Alan Robert Charlesworth | October 16, 1960 | 27 |
| Saundra Ayers Charlesworth | September 29, 1961 | 26 |
| Cassie Anne Charlesworth | June 28, 1983 | 4 |
| Cara Lee Charlesworth | May 3, 1986 | 1 |
| Robert Lonnie Charlesworth | September 24, 1987 | 0 |

131. Lynn Martineau Webb and Jeannine Anderson Webb were married on June 7, 1980. Richard A. Riding and Monica Harris Riding were married on July 17, 1981. Alan Robert Charlesworth and Saundra Ayers Charlesworth were married on December 18, 1982.

132. Based on the testimony of the plaintiffs' experts, as given at the trial, Lynn Martineau Webb had a normal life span of 73.9 years and an expected retirement age of 65 years of age. Richard A. Riding had a normal life span of 74.1 years and an expected retirement age of 61.1.

133. The passengers on the plane, Lynn M. Webb and Richard A. Riding, were partners in a vending business, Vends Unlimited. They were traveling to Roswell in order to examine the area as a potential site for the placement of vending machines.

134. The pilot, Alan R. Charlesworth, was an insurance sales agent for Prudential Insurance. Charlesworth was not involved in Mr Webb's and Mr. Riding's vending business.

135. Prior to the formation of Vends Unlimited, just three months before the accident, Mr. Webb was employed as a baker. He also had held jobs in the linen and cable T.V. industries. Mr. Riding had been employed with Utah Power and Light Company for almost six years.

136. Mrs. Jeannine Anderson Webb and her children sustained substantial economic losses as a result of the death of Lynn Webb. Each child derived economic benefits from Mr. Webb in varying amounts and at varying intervals.

137. The present value of the economic loss sustained by the Webb heirs as of December 1, 1991, was $776,520.00. This figure is based on the testimony and exhibits presented at the trial concerning the loss of earned income, employment fringe benefits, household services, funeral expenses, less personal consumption and applicable income taxes.

138. Mrs. Monica Harris Riding and her children sustained substantial economic losses as a result of the death of Richard A. Riding. Each child derived economic benefits from Mr. Riding in varying amounts and at varying intervals.

139. The present value of the economic loss sustained by the Riding heirs as of December 1, 1991, was $1,139,008.00. This figure is based on the testimony and exhibits presented at the trial concerning the loss of earned income, employment fringe benefits, household services, funeral expenses, less personal consumption and applicable income taxes.

140. Mrs. Saundra Ayers Charlesworth and her children sustained substantial economic losses as a result of the death of Alan R. Charlesworth. Each child derived economic benefits from Mr. Charlesworth in varying amounts and at varying intervals.

141. The present value of the economic loss sustained by the Charlesworth heirs as of June 30, 1992, was $2,072,491.00. This figure is based on the testimony and exhibits presented at the trial concerning the loss of

earned income, employment fringe benefits, household services, funeral expenses, less personal consumption and applicable income taxes.

142. In addition to economic losses, Jeannine Anderson Webb and the Webb children have suffered loss of consortium damages as a result of Lynn M. Webb's death. Each enjoyed a close, loving relationship with the deceased, and relied on him for loving guidance, companionship, and advice.

143. In addition to economic losses, Monica Harris Riding and each of the Riding children have suffered loss of consortium damages as a result of Richard A. Riding's death. Each enjoyed a close, loving relationship with the deceased, and relied on him for loving guidance, companionship, and advice.

144. In addition economic loss, Saundra Ayers Charlesworth and the Charlesworth children have suffered loss of consortium damages as a result of the Alan R. Charlesworth's death. Each enjoyed a close, loving relationship with the deceased, and relied on him for loving guidance, companionship, and advice.

### CONCLUSIONS OF LAW

### JURISDICTION AND CHOICE OF LAW

1. These consolidated actions, alleging negligence on the part of FAA employees, are brought pursuant to the Federal Tort Claims Act, 28 U.S.C. § 1346(b) ("FTCA").

2. In FTCA cases such as this, federal courts apply the whole law, including the choice of law rules, of the state where the alleged last act or omission, or alleged act having the most significant causal effect, occurred. *Richards v. United States*, 369 U.S. 1, 82 S.Ct. 585, 7 L.Ed.2d 492 (1962); *Bowen v. United States*, 570 F.2d 1311, 1318 (7th Cir.1978).

3. This court has already determined that New Mexico is the state where the alleged last act or omission, or alleged act having the most significant causal effect, occurred. Hence, the court will apply the whole law of New Mexico, including its choice of law rules.

4. New Mexico applies the test of *lex loci delicti*, or "place of wrong" to tort cases. *Zamora v. Smalley*, 68 N.M. 45, 358 P.2d 362, 363 (1961); *First Nat'l Bank in Albuquerque v. Benson*, 89 N.M. 481, 553 P.2d 1288 (Ct.App.), *cert. denied*, 90 N.M. 7, 558 P.2d 619 (1976).[7] The "place of wrong" is the location of the last act necessary to complete the injury. *Id.;* Restatement (First) of Conflict of Laws, § 378 (1934). An exception to this rule exists when it requires the application of another state's law, and that application would violate New Mexico public policy. *Wittkowski v. State Corrections*, 103 N.M. 526, 710 P.2d 93 (Ct.App. 1985), *overruled in part on other grounds by Silva v. State*, 106 N.M. 472, 745 P.2d 380 (1987). Plaintiffs allege that the last act necessary to complete the injury was carried out by FAA employees working in the Roswell, New Mexico Flight Service Station and Control Tower. Following the *lex loci delicti* approach, the court will therefore apply New Mexico law to the liability and causation issues of this case. Since New Mexico law will be applied, and not the law of a sister state, the exception set forth in *Wittkowski* is inapplicable.

### NEW MEXICO'S NEGLIGENCE LAW GENERALLY

5. While federal regulations, and manuals prescribe important duties of pilots and FAA personnel, New Mexico law provides the basic framework of tort law governing this case. *Tinkler v. United States*, 982 F.2d 1456, 1466 (10th Cir.1992).

6. Under New Mexico law, plaintiffs must prove the following elements of their negligence action by the greater weight of the evidence: 1) a duty or obligation, recognized by the law, requiring the actor to conform to a certain standard of conduct, for the protection of others against unreasonable risks; 2) a breach of that duty; 3) a reasonable close connection between the conduct and the resulting injury (proximate cause);

---

7. New Mexico has adopted the Second Restatement's "most significant relationship" test in contract cases. *Stevenson v. Louis Dreyfus Corp.*, 112 N.M. 97, 811 P.2d 1308 (1991).

and, 4) actual loss or damage resulting to the interests of another. *Lopez v. Maez*, 98 N.M. 625, 651 P.2d 1269, 1274 (1982).

■ 7. In New Mexico, the plaintiff has the burden of proving negligence when there has been a general denial by the defendant. *Riseling v. Potash Mines Trans. Co.*, 76 N.M. 544, 417 P.2d 38, 39 (1966) (citation omitted). As a general rule, negligence must be proved and will not be presumed. *Archibeque v. Homrich*, 88 N.M. 527, 543 P.2d 820, 824 (1975).

## LEGALLY RECOGNIZED DUTY

8. Plaintiff must first establish that the FAA employees who had contact with the pilot had a legally recognized duty to conform to a standard of conduct designed to protect others from an unreasonable risk of injury.

9. In order to establish negligence, plaintiffs must show that these individuals breached their legally recognized duty. This breach must be one which a reasonably prudent person would foresee as involving an unreasonable risk of injury to himself or another and which such a person, in the exercise of ordinary care, would not do. *See Cotter v. Novak*, 57 N.M. 639, 261 P.2d 827, 828 (1953) (citation omitted).

■ 10. In airplane tort cases, the pilot and FAA personnel, including FSS specialists and controllers, are burdened with concurrent duties of due care for the protection of the aircraft and its occupants. *Spaulding v. United States*, 455 F.2d 222, 226 (9th Cir.1972); *Worthington v. United States*, 807 F.Supp. 1545, 1565 (S.D.Ga.1992).

■ 11. Because both are responsible for the safety of the aircraft, negligence on the part of the pilot does not automatically relieve FAA personnel of their duties of care. *Worthington*, 807 F.Supp. at 1565. By the same token, FAA negligence does not relieve the pilot of his primary duty and responsibility for the safe operation of his airplane. *Spaulding*, 455 F.2d at 226; 14 C.F.R. § 91.-3(a).

## I. PILOT CHARLESWORTH's NEGLIGENCE

*Standards of Care and Duties of Pilots*

■ 12. The Federal Aviation Regulations ("FAR's") have the force and effect of law. *Tinkler v. United States*, 700 F.Supp. 1067, 1073 (D.Kan.1988), *aff'd*, 982 F.2d 1456 (10th Cir.1992). Violation of an FAR by a pilot constitutes negligence as a matter of law. *Davis v. United States*, 643 F.Supp. 67, 77 (N.D.Ill.1986), *aff'd*, 824 F.2d 549 (7th Cir.1987).

13. Pilots must study and know the appropriate provisions of the Airman's Information Manual ("AIM") pertaining to their flying activities. *Associated Aviation Underwriters v. United States*, 462 F.Supp. 674, 680 (N.D.Tex.1978).

14. The pilot of the aircraft is directly and ultimately responsible for the operation of his aircraft. *Davis v. United States*, 824 F.2d 549, 551 (7th Cir.1987); *Redhead v. United States*, 686 F.2d 178, 182 (3rd Cir. 1982), *cert. denied*, 459 U.S. 1203, 103 S.Ct. 1190, 75 L.Ed.2d 435 (1983); *Spaulding v. United States*, 455 F.2d 222, 226 (9th Cir. 1972); *Tinkler*, 700 F.Supp. at 1073; 14 C.F.R. § 91.3(a).

■ 15. Pilots are charged with that which they should have known in the exercise of the highest degree of care. *Redhead*, 686 F.2d at 182; *American Airlines, Inc. v. United States*, 418 F.2d 180, 193 (5th Cir. 1969).

A. *Obtaining Pre–Flight Weather Information*

■ 16. The pilot has a duty to obtain a pre-flight weather briefing, to adequately apprise himself of the weather before taking off, and to apprise himself of the weather conditions along the way. *Tinkler v. United States*, 982 F.2d 1456, 1465 (10th Cir.1992); *Black v. United States*, 441 F.2d 741, 744 (5th Cir.), *cert. denied*, 404 U.S. 913, 92 S.Ct. 233, 30 L.Ed.2d 186 (1971); 14 C.F.R. § 91.103; AIM § 290(b). The law ultimately places the burden on the pilot, not the FSS, to assure that the pilot has the most recent weather information before taking a flight. *Davis*, 643 F.Supp. at 77. For

this reason, pilots are required to "learn to obtain, read, and understand aviation weather forecasts and reports." FAA Flight Training Handbook at 166.

17. Pilots are not inactive participants in the briefing process. They should know what type of weather information they need before taking off, and should actively pursue that information, requesting it if it is not provided by the weather briefer. AIM ¶¶ 290d, 290g, 502a, 502c, 502d, 502f.

 18. When the plane left Salt Lake Airport Pilot Charlesworth knew, or was charged with the knowledge, that he had not yet received crucial weather information including such things as (1) the Area Forecast; (2) the Roswell Terminal Forecast; (3) pertinent NOTAM's; and (4) current weather conditions. During the 7:17 a.m. contact with the Cedar City FSS, Specialist Poulson gave the pilot a VNR recommendation for the Salt Lake Airport and asked the pilot if he wanted "the rest of the weather." Appendix C at 1418:11. The pilot did not pursue this opportunity to obtain a full weather briefing even though he knew, or should have known, that his previous two briefings had been limited to only a general outlook briefing, and a "very general weather brief" given while the weather computer was inoperable. A reasonably prudent pilot would have taken this opportunity provided him during the 7:17 a.m. contact to obtain complete weather information or would have provided adequate background information to Specialist Poulson. In this regard, during an abbreviated briefing for update information such as this, pilots are instructed to provide the following information, if it is not requested by the briefer: the time of the previous briefing, the source of the previous briefing, and other necessary background information. AIM ¶ 502c. The pilot's failure to do this constituted negligence, and prevented the pilot from being informed of the important weather information he had not yet received concerning the Roswell area. Specialist Poulson was also negligent and failed in his concurrent duty to obtain background information necessary to provide an adequate and accurate update briefing.

 19. The pilot and FAA personnel have concurrent duties of care. *Spaulding v. United States*, 455 F.2d 222, 226 (9th Cir. 1972); *Worthington v. United States*, 807 F.Supp. 1545, 1565 (S.D.Ga.1992). While the Cedar City FSS personnel acted negligently during the pre-flight contacts, this negligence did not excuse Pilot Charlesworth of his strict duties as a pilot. *Spaulding*, 455 F.2d at 226; 14 C.F.R. § 91.3(a). Under the circumstances herein, pilot Charlesworth was negligent in taking off from Salt Lake City without adequately apprising himself of the weather along the route of flight.

### B. *Obtaining In–Flight Weather Information*

 20. Since he had not received an adequate weather briefing on the ground, Pilot Charlesworth should have obtained one while in-flight between Salt Lake City and Albuquerque. He had an opportunity and duty to do this when he contacted Specialist Mackay to open the flight plan at 8:41 a.m. on February 5.

21. While on the ground in Albuquerque, Charlesworth was warned by the owner of the plane in a telephone conversation about a possible storm in Southern New Mexico. After this warning, he had a duty to obtain information concerning conditions in Roswell before placing his plane in adverse weather. No evidence in the record establishes that the pilot did or did not make such contacts before taking off from Albuquerque. In any event, it was not unreasonable for Charlesworth to wait until the 2:31 p.m. contact with FSS Specialist Byrom to obtain this information. At that time, the plane was flying in clear sky, and had sufficient fuel to return to Albuquerque or to fly to an alternative airport before reaching adverse weather conditions.

### C. *Avoiding Adverse Weather Conditions*

 22. The pilot has a duty to avoid adverse weather conditions. *Tinkler*, 982 F.2d at 1465. Regardless of the information, or lack thereof, the pilot receives from FAA personnel, the pilot has a continuing duty to be vigilant and aware of danger he can perceive with his own eyes. He cannot "ignore

the weather information he has been given or disregard the weather conditions he sees around him." *Spaulding,* 455 F.2d at 227; *Black,* 441 F.2d at 743 (blind reliance on lack of information does not absolve the pilot from the affirmative duty to observe, recognize, and avoid adverse weather conditions).

23. The final decision whether to attempt to land or divert to another airport rests with the pilot. He is in the best position to observe and judge the actual effect of the weather on the plane's approach. *Ingham v. Eastern Air Lines, Inc.,* 373 F.2d 227, 237 (2d Cir.), *cert. denied,* 389 U.S. 931, 88 S.Ct. 295, 19 L.Ed.2d 292 (1967).

24. Pilots are expected to be aware of the option of diverting the flight to another airport. *Ward v. United States,* 462 F.Supp. 667, 672 (N.D.Tex.1978).

25. In the midst of variable weather conditions, the controller is usually in no better position to inform the pilot of changing weather conditions than the pilot himself. *Worthington,* 807 F.Supp. 1545, 1569 (S.D.Ga.1992). Under such circumstances, "decisions that depend upon conditions known in detail only by the pilot must be made by him." *Redhead,* 686 F.2d at 183; *Michelmore v. United States,* 299 F.Supp. 1116, 1119 (C.D.Cal.1969), *aff'd sub nom., Spaulding v. United States,* 455 F.2d 222 (9th Cir.1972).

26. Whenever a pilot receives a clearance to land from ATC which, in the pilot's judgment, would jeopardize the safety of the plane and its passengers, that pilot has an absolute duty to reject that clearance, to inform ATC, and request a new clearance. *Worthington,* 807 F.Supp. at 1568; *In re Air Crash At Dallas/Fort Worth Airport,* 720 F.Supp. 1258, 1290 (N.D.Tex.1989), *aff'd,* 919 F.2d 1079 (5th Cir.), *cert. denied sub nom. Connors v. United States,* —— U.S. ——, 112 S.Ct. 276, 116 L.Ed.2d 228 (1991); *In re Air Crash Disaster at Boston Mass., July 31, 1973,* 412 F.Supp. 959, 989 (D.Mass.1976), *aff'd sub nom. Delta Air Lines, Inc v. United States,* 561 F.2d 381 (1st Cir.1977), *cert. denied,* 434 U.S. 1064, 98 S.Ct. 1238, 55 L.Ed.2d 764 (1978).

27. During a VFR flight, the pilot has the responsibility to provide his own separation from obstructions, clouds, and other aircraft. It is the pilot's duty to keep visual flight minimums necessary for a VFR approach, or a Special VFR approach, and if he encounters conditions below prescribed minimums, then he must execute a missed approach. *Redhead,* 686 F.2d at 183; *Miller v. United States,* 587 F.2d 991, 996 (9th Cir.1978).

28. The pilot learned from the 2:31 p.m. contact with Specialist Byrom that the conditions at the Roswell Airport, while VFR, were at the VFR legal minimum requirements.

29. The pilot learned from Controller Brown at 2:48 p.m. that the conditions at the Roswell Airport had worsened to IFR. At 2:52 p.m., after obtaining the Special VFR clearance, the pilot was informed that there were 28 inch snow banks on either side of the runway. At this moment, the pilot was still 17.9 miles northwest of the airport, flying at 6,000 feet, in clear sky, with sufficient fuel to return to Albuquerque or fly to an alternative airport experiencing VFR conditions. Moreover, Pilot Charlesworth could see the storm around Roswell with his own eyes.

30. The FAA *Flight Training Handbook* states on page 116, that VFR legal minima are "absolute *minimum* requirements and are not recommended for pilots having limited experience." A pilot has the right to attempt a Special VFR landing if he feels that he can carry it out safely. However, it is the pilot's responsibility to make that determination, and that determination must be reasonable based on the conditions facing the pilot, and the pilot's experience and skill.

31. Attempting a Special VFR approach under the circumstances, known to the pilot, which existed near Roswell at the time of the crash may have been reasonable for an experienced pilot. However, such an attempt was not reasonable for a pilot, such as Charlesworth, with limited experience. This was especially true considering the foreseeable possibility of experiencing a whiteout phenomenon under these conditions. It was even more unreasonable for Charlesworth

not to abort the approach after receiving the NOTAM's explaining the snow conditions at the airport. Charlesworth's continued pursuit of the Special VFR approach under these circumstances constituted negligence.

## II. FSS SPECIALISTS' AND AIR TRAFFIC CONTROLLERS' NEGLIGENCE

### A. Standards of Care and Duties of FSS Specialists

32. The *Flight Service Manual* ("FSM") prescribes agency procedures and policies pertaining to the duties of FSS specialists. However, reference to the FSM does not complete the analysis of FSS duties. Those duties arise "from both the dictates of the *Flight Service Manual* as well as the reliance pilots place on FSS briefers." *Tinkler v. United States*, 982 F.2d 1456, 1461 (10th Cir.1992); *Moorhead v. Mitsubishi Aircraft Intern., Inc.*, 828 F.2d 278, 282 nn. 13–14 (5th Cir.1987).

33. FSS specialists have a duty to provide the pilot with the information he or she requests. To fulfill that duty, the specialists must give a direct response which is both accurate and complete. *Budden v. United States*, 963 F.2d 188, 194 (8th Cir. 1992) (citing *Norwest Capital Management & Trust Co. v. United States*, 828 F.2d 1330, 1333 (8th Cir.1987)); *Tinkler v. United States*, 700 F.Supp. 1067, 1074 (D.Kan.1988), *aff'd*, 982 F.2d 1456 (10th Cir.1992).

34. FSS specialists must exercise due care in giving information concerning hazardous weather conditions that might influence pilots to alter their proposed flight plans. *Moorhead*, 828 F.2d at 282.

35. FAA employees, both FSS specialists and controllers, may assume that a pilot is familiar with and will abide by all appropriate Federal Aviation Regulations ("FAR's"). *Tinkler*, 700 F.Supp. at 1075; *Colorado Flying Academy, Inc. v. United States*, 506 F.Supp. 1221, 1228 (D.Colo.1981), *aff'd*, 724 F.2d 871 (10th Cir.1984), *cert. denied*, 476 U.S. 1182, 106 S.Ct. 2915, 91 L.Ed.2d 544 (1986). They have no duty to warn the pilot of things he should already know based on his training, experience, and

personal observations. *Redhead v. United States*, 686 F.2d 178, 183 (3rd Cir.1982), *cert. denied*, 459 U.S. 1203, 103 S.Ct. 1190, 75 L.Ed.2d 435 (1983); *Worthington v. United States*, 807 F.Supp. 1545, 1568 (S.D.Ga.1992); *Davis v. United States*, 643 F.Supp. 67, 76–77 (N.D.Ill.1986), *aff'd*, 824 F.2d 549 (7th Cir.1987). In a non-emergency situation, FAA ground personnel do not have the responsibility to quiz the pilot on his experience or qualifications. *Spaulding v. United States*, 455 F.2d 222, 117 (9th Cir.1972).

36. Likewise, FAA employees are not required to foresee unlawful, negligent, or grossly negligent acts of pilots. *Pierce v. United States*, 718 F.2d 825, 830 (6th Cir. 1983); *Tinkler*, 700 F.Supp. at 1075; *Davis v. United States*, 643 F.Supp. at 77; *Colorado Flying Academy, Inc.*, 506 F.Supp. at 1228.

37. FSS specialists have no duty to "quiz the pilot on his qualifications and flight plan, or to offer a gratuitous opinion that he should delay his flight." *Spaulding v. United States*, 455 F.2d 222, 227 (9th Cir.1972). "[J]udgment as to whether and when weather conditions permit take-off is for the pilot." *Id.* (quoting *Stork v. United States*, 430 F.2d 1104, 1107 (9th Cir.1970)); *Davis*, 643 F.Supp. at 70.

38. FSS specialists acting as weather briefers only have the obligation to provide pilots with the weather information currently available to the briefer at the time of the briefing. *Davis*, 643 F.Supp. at 76.

### B. Standards of Care and Duties of Air Traffic Controllers

39. Controllers have the responsibility to promote the safe, orderly, and expeditious flow of air traffic. *Worthington*, 807 F.Supp. at 1566.

40. FAA policies and procedures with regard to the responsibilities of controllers are set forth in the *Air Traffic Control Manual* ("ATCM") as well as applicable FAA regulations. However, as with FSS specialists, a controller's duty is not outlined exclusively in the ATCM. It arises from both the ATCM as well as the reliance pilots place on

controllers. *Worthington,* 807 F.Supp. at 1566–1567; *Himmler v. United States,* 474 F.Supp. 914, 931 (E.D.Pa.1979).

■ 41. Due to the dangers and risk to life and property inherent in airplane flight, controllers, of necessity, assume a high degree of responsibility, and their duty of care rises accordingly. *Himmler,* 474 F.Supp. at 928. "There is always the possibility that tragic accidents may occur in a matter of seconds if controllers ... relax from constantly overseeing an aircraft to promote its safety in flight." *Id.*

■ 42. Controllers' first priority is to direct airplane traffic and to prevent collisions. However, controllers have a secondary duty to provide the current weather. *Himmler,* 474 F.Supp. at 929. This secondary duty includes the obligation to report subsequent weather changes which, under all the circumstances, the pilot would consider important in determining whether to attempt a landing, and in preparing for the weather conditions likely to be encountered inside the control zone. *Ingham v. Eastern Air Lines, Inc.,* 373 F.2d 227, 326 (2d Cir.), *cert. denied,* 389 U.S. 931, 88 S.Ct. 295, 19 L.Ed.2d 292 (1967); *Himmler,* 474 F.Supp. at 930.

■ 43. Controllers may assume that a pilot is familiar with and complies with applicable FAR's. *Worthington,* 807 F.Supp. at 1568. Controllers are not required to foresee unlawful, negligent, or grossly negligent acts of pilots. *Pierce v. United States,* 718 F.2d 825, 830 (6th Cir.1983); *Tinkler v. United States,* 700 F.Supp. 1067, 1075 (D.Kan.1988), *aff'd,* 982 F.2d 1456 (10th Cir. 1992); *Davis v. United States,* 643 F.Supp. 67, 77 (N.D.Ill.1986), *aff'd,* 824 F.2d 549 (7th Cir.1987); *Colorado Flying Academy, Inc. v. United States,* 506 F.Supp. 1221, 1228 (D.Colo.1981), *aff'd,* 724 F.2d 871 (10th Cir. 1984), *cert. denied,* 476 U.S. 1182, 106 S.Ct. 2915, 91 L.Ed.2d 544 (1986).

■ 44. Generally, controllers need not warn the pilot of situations that he should already be aware of based on his training, experience, and personal observations. *Redhead v. United States,* 686 F.2d 178, 183 (3d Cir.1982), *cert. denied,* 459 U.S. 1203, 103 S.Ct. 1190, 75 L.Ed.2d 435 (1983); *Neff v.*

*United States,* 420 F.2d 115 (D.C.Cir.1969), *cert. denied,* 397 U.S. 1066, 90 S.Ct. 1500, 25 L.Ed.2d 687 (1970); *Himmler,* 474 F.Supp. at 935 (no duty to warn of situations which are just as obvious to the pilot as they are to the controller).

■ 45. Controllers have a duty to warn pilots of dangers reasonably apparent to the controller, but not apparent, in the exercise of due care, to the pilot. *Spaulding v. United States,* 455 F.2d 222, 226 (9th Cir.1972); *American Airlines, Inc. v. United States,* 418 F.2d 180, 193 (5th Cir.1969); *Colorado Flying Academy, Inc.,* 506 F.Supp. at 1228 (D.Colo.1981); *Associated Aviation Underwriters v. United States,* 462 F.Supp. 674, 681 (N.D.Tex.1978) (duty to warn if the controller has actual knowledge of a hazardous current weather condition which the pilot may encounter and of which he may not yet be aware) (citing *Rowe v. United States,* 272 F.Supp. 462, 472 (W.D.Pa.1964)).

■ 46. Notwithstanding the general rule that controllers have no duty to foresee negligent acts of pilots, "controllers cannot sit passively by and watch someone commit a negligent act, or a grossly negligent act, without attempting to do something by way of a warning to dissuade the actor." *Himmler,* 474 F.Supp. at 943. "[T]he regulations and manual do not make mere automata of the controllers. Their job requires that they act in the interests of safety." *Stork v. United States,* 430 F.2d 1104, 1108 (9th Cir.1970) (quoting *United States v. Furumizo,* 381 F.2d 965, 968 (9th Cir.1967)).

■ 47. A controller is not required to apply emergency procedures unless an emergency is declared by the pilot, or the pilot indicates that he is having difficulty completing the planned flight. *Himmler,* 474 F.Supp. at 936. In non-emergency situations, controllers do not have a duty to question a pilot's qualifications or to make any determinations regarding the pilot's capabilities. *Worthington,* 807 F.Supp. at 1568.

■ 48. A controller has no duty to direct an incoming flight to another airport unless the pilot requests it, makes a declaration of emergency, or indicates he is having

difficulty flying. *Id.* 474 F.Supp. at 936–937; *Kullberg v. United States,* 271 F.Supp. 788, 800 (W.D.Pa.1964).

 49. Depending on the circumstances of each case, due care may require a controller, over and beyond the requirements of the manuals, to delay a clearance to land. *American Airlines, Inc.,* 418 F.2d at 193. Generally, however, there is no ground for a controller to deny a clearance if the minimum requirements for such a clearance are met. *Ward v. United States,* 462 F.Supp. 667, 674 (N.D.Tex.1978). Once a clearance is duly given, the operation of the aircraft becomes the sole responsibility of the pilot, and the air traffic controller is not to interfere except as specifically required by the FAA manuals. *American Airlines, Inc.,* 418 F.2d at 193; *Ward,* 462 F.Supp. at 674.

### C. *Providing Pre–Flight Weather Information*

 50. Pilot Charlesworth contacted FSS Specialist Walstad and asked for a general outlook briefing when he first made contact with FSS on February 4, 1988, 1:04 p.m.[8] In these circumstances, based upon the requirements set forth in FSM ¶ 3–12b, Specialist Walstad had a duty to provide a reasonable "general weather outlook" using forecast information, and to inform the pilot when he could obtain complete weather information. The reasonableness of Walstad's general weather outlook must be determined based upon the information available to Walstad during the brief, and not on the actual weather conditions at the time of the flight.

 51. Walstad's general outlook was reasonable based on the weather information he had available to him at the time of the contact and he fulfilled his duty to inform the pilot when he could call back for complete weather information. However, Specialist Walstad failed to provide the pilot with the information contained in the Roswell Terminal Forecast, which was valid through the time of planned arrival in Roswell, 12:00 noon on February 5. Even though Specialist Walstad advised that the planned departure time

from Salt Lake City, 5:30 a.m. would not be feasible, he still had a duty to provide the forecast information available for the valid time period for the planned flight. His failure to provide the pilot with the Roswell Terminal Forecast constituted negligence.

 52. The pilot again called Specialist Walstad at the Cedar City FSS for a full weather briefing at 4:33 a.m. on February 5, 1988.[9] Since the weather computer was down, and had been inoperable for most of the night, Specialist Walstad had a duty to (1) inform the pilot of the problem; (2) brief the pilot to the extent possible; and (3) as appropriate, provide the pilot with the telephone number of another FSS, a NWS office, or advise the pilot of the time the data was expected to be available. FSM ¶ 3–5.

53. Specialist Walstad informed the pilot of the computer problem, and told him that he could only provide a "very general weather brief."

54. Walstad was not negligent in providing the "general weather" brief. The brief was reasonable based upon the weather information he had available to him at the time. This is so because the reasonableness of this weather brief must be determined based upon the information available to Walstad during the brief, and not on the actual weather conditions at the time of the flight.

55. Specialist Walstad was negligent in not furnishing the pilot with the number of another FSS, or a NWS office. That duty is based upon the requirements of FSM ¶ 3–5.

56. Specialist Walstad breached his duty and was negligent in filling out the flight plan form (FAA Form 7233–1) by not indicating on that form that he had been unable to provide the pilot with complete weather information. This duty is based upon the requirements of FSM ¶ 3–7b and the safe practices incumbent upon FSS specialists in general.

 57. Employees at the Cedar City FSS had a duty, based upon the transfer of responsibility procedures set forth in FSM ¶ 1–33a, to pass on to later shifts the fact

---

**8.** *See* Findings of Fact Nos. 19–27.

**9.** *See* Findings of Fact Nos. 28–42.

that the weather computer had been down for most of the night. Individuals leaving their shift have the duty to inform their relievers of such significant problems. Walstad only had the duty to inform the particular individual relieving him of the problem. Neither Specialist Poulson nor Specialist Mackay relieved Walstad.

58. The FSS is required to use Form 7230–4, Daily Record of Operation, to describe significant conditions within the facility. Information concerning the computer being inoperable was not included on the Form 7230–4. Responsibility for completing the Form 7230–4 lies with the controller-in-charge.

59. Regardless of whose obligation it was to inform later shifts that the computer had been down for most of the night, it appears that neither Specialist Poulson nor Specialist Mackay were so informed. Failure to do this constituted negligence on the part of the FAA.[10]

 60. Pilot Charlesworth called Specialist Poulson at the Cedar City FSS at 7:17 a.m. on February 5 and requested a weather briefing.[11] Specialist Poulson was unsure which type of weather briefing had been requested. Under these circumstances, based upon FSM ¶ 3–6, Poulson had a duty (1) to give the first one or two items requested; (2) to ask the pilot whether he would like a standard weather briefing; and (3) if a standard weather briefing is not requested, to provide the pilot with the type of briefing requested (i.e. In this case, an abbreviated briefing for specific information, an abbreviated briefing for update information, or both).

61. Specialist Poulson fulfilled his duty to provide the first one or two items requested and gave the pilot the opportunity to obtain a standard weather briefing.

62. Poulson interpreted the pilot's request as one for an abbreviated briefing for specific information, as well as one for an abbreviated briefing for update information.

63. With a request for specific information, Poulson had a duty to respond to the pilot's question, and inform the pilot of the existence of any adverse conditions. FSM ¶ 3–11a. Poulson's duty with regard to adverse conditions only involved those adverse conditions which pertained to the specific information requested by the pilot. Poulson fulfilled this duty by fully responding to the pilot's request for specific information, and informing the pilot of the existence of accompanying adverse conditions surrounding the Salt Lake Airport.

64. With a request for update information, Poulson had a duty to obtain from the pilot the time of his previous briefing, to obtain other necessary background information, and, to the extent possible, to limit the briefing to appreciable changes in meteorological and aeronautical conditions since the previous briefing. FSM § 3–11. Poulson breached his duty in failing to obtain the time of the previous briefing and other pertinent background information. Poulson's update information was generally accurate with regard to the route of flight up to the immediate Roswell area. However, as a result of his failure to obtain necessary background information concerning the pilot's previous briefing, Poulson's update information concerning the immediate Roswell area failed to sufficiently apprise the pilot of the meteorological and aeronautical conditions which the pilot had not received during the 4:33 a.m. contact. In this respect, Poulson's inadequate update briefing constituted negligence.

65. Specialist Poulson's negligence with regard to the update information he provided the pilot was furthered when Poulson marked "update" on the Flight Plan Form 7233–1. This marking mislead Specialist Mackay into believing that the pilot had received adequate update weather information. *See* FSM ¶ 3–7b.

66. Specialist Poulson had a duty, based on FSM ¶ 3–7b, to accurately record the information provided the pilot on the Flight Plan Form 7233–1. Poulson breached this duty in failing to mark the VNR block after

---

10. *See* Findings of Fact Nos. 43–45.

11. *See* Findings of Fact Nos. 46–63.

he had given the pilot a VNR recommendation.

### D. *Providing In–Flight Weather Information*

■ 67. After taking off from Salt Lake on Feb. 5, 1988 8:41 a.m., the pilot contacted Specialist Mackay at the Cedar City FSS to open and amend his flight plan.[12] Specialist Mackay had a duty to open the flight plan and accurately amend it in accordance with the pilot's new flight path. Specialist Mackay fulfilled this duty. If Specialist Mackay had known that the pilot had not yet received complete weather information, he would have been required to provide that information during the in-flight contact. FSM ¶ 4–3a; AIM ¶ 295d. Mackay did not know from the flight plan, from any other FSS source, or from the pilot himself that the pilot had not yet received adequate weather information. Specialist Mackay reasonably relied on the notations made by Specialist Poulson that the pilot had been provided with an update briefing. Specialist Mackay's conduct, therefore, conformed with his established duties, and did not constitute negligence.

### E. *Assisting Pilot to Avoid Adverse Weather Conditions*

68. One hour after taking off from the Coronado Airport, on Feb. 5, 1988 2:31 p.m., the pilot contacted Specialist Berrier D. Byrom at the Roswell FSS and requested the current Roswell weather.[13] This was a "Routine Radio Contact." Under the facts of this case, Byrom had the duty, based on FSM ¶ 4–14 and ¶ 4–3, to (1) follow the procedures applicable to an abbreviated briefing for specific information; and (2) provide the pilot any pertinent NOTAM's.

69. Since the contact by pilot Charlesworth required the giving of an abbreviated briefing for specific information, Specialist Byrom had a duty accurately to provide the information requested and also to inform the pilot of the existence of any adverse conditions. FSM ¶ 4–3. Byrom fulfilled his duty to relate the current Roswell weather by providing to the pilot the most recent surface weather observation, and stating that the conditions at the airport were VFR.

■ 70. Specialist Byrom breached his duty under FSM ¶ 4–3 by failing to inform the pilot of the existence of pertinent adverse conditions, present or forecast. This constituted negligence. The danger of experiencing the whiteout phenomenon under the conditions which existed at the time of the 2:31 p.m. contact were foreseeable to Specialist Byrom, but he failed to warn the pilot of this danger. This constituted negligence.

71. Because this was a Routine Radio Contact, Byrom had a duty to provide the pilot with pertinent NOTAM's concerning the Roswell Airport. Byrom's failure to do this constituted negligence.

72. Byrom did not give the pilot a VNR recommendation ("VFR not recommended") during this contact. Byrom would have a duty to give this recommendation if the conditions were such that, in Byrom's judgment, VFR flight would be doubtful. FSM ¶ 3–10b(2); AIM ¶ 502b(2). Even though the reported conditions at the Roswell Airport were VFR during this contact, those conditions barely met legal VFR minimums. Moreover, the weather was fluctuating rapidly. Under these circumstances, it was a breach of Byrom's duty not to give a VNR recommendation.

73. Under the circumstances which prevailed at the Roswell Airport during this contact, Byrom had a duty to actively solicit and disseminate PIREP's. Byrom failed to solicit PIREP's from this pilot and in so doing breached this duty. However, based on the finding that there were no planes in the area within an hour before the 2:31 p.m. contact, Byrom did not breach any duty by not providing the pilot with pertinent PIREP's during the contact.

74. Specialist Byrom had no duty to call the pilot back with the 2:36 p.m. special surface weather observation, although it would not have been imprudent for him to do so. Byrom instructed the pilot to contact the Roswell Tower, and then reasonably provid-

---

12. *See* Findings of Fact Nos. 66–69.

13. *See* Findings of Fact Nos. 75–92.

ed the Tower with that special surface weather observation. The information contained in the 2:36 p.m. observation was made available to the pilot by Controller Brown when he made contact with the tower at 2:48 p.m.

F. *Attempted Landing with Special VFR Clearance*

75. At 2:48 p.m., approximately 13 minutes before the plane crashed, Pilot Charlesworth contacted the Roswell Tower and requested clearance for a VFR landing.[14] Controller Brown accurately provided the pilot with the current weather conditions, and correctly informed him that the field was IFR. The pilot asked to be directed to another airport. Brown failed to hear this request, or did not understand it, and asked the pilot, "What are you requesting archer eight four seven one foxtrot?" The pilot then responded that he was requesting a Special VFR clearance to land.

76. Controller Brown had a duty to clearly articulate his directions to the pilot. When a communication is not heard or understood, the ATCM directs controllers to use the statements, "say again," or "repeat." ATCM ¶ 2–82. While he did not technically use this official FAA phraseology, Controller Brown articulated to the pilot that he either did not hear or did not understand the pilot's request for directions to another airport. While use of the approved and recommended language may have evoked a different response from the pilot, Brown substantively complied with his duty to clearly articulate his directions to the pilot.

77. Brown had a duty not to clear the pilot for a Special VFR landing if the minimum legal requirements for such a landing were not met. Because the minimum legal requirements were met in this case (prevailing visibility inside the control zone at least one statute mile), Brown was not negligent in clearing the pilot for a Special VFR landing.

78. While communicating with the pilot, Controller Brown was not wearing his headset, but rather was utilizing the tower's speaker phone. This is an accepted and reasonable practice in Air Traffic Control Towers during long periods of slow traffic. The fact that Brown did not use a headset did not constitute negligence since it did not hinder, in any substantial way, the communication between the Charlesworth and the Roswell tower. While it may have been one cause for failure to hear pilot Charlesworth's first request to be directed to an alternative airport, it did not prevent the pilot from pursuing that request.

79. Controller Brown had a duty to inform the pilot in a timely manner of the relevant NOTAM's. ATCM ¶ 3–32. Brown complied with this duty by providing the pilot with NOTAM information while the pilot was still 17.9 miles northwest of the airport, at 6,000 feet, flying in clear sky, with sufficient fuel to reach several safe alternative airports, including Albuquerque.

80. Controller Brown had a duty to remain in sufficient contact with the pilot during the Special VFR approach. Brown complied with this duty.

81. As Roswell is not equipped with RADAR, Brown had no duty to provide the pilot with RADAR related "Additional Services" set forth in ATCM ¶ 2–2b. Other "Additional Services" were either provided the pilot through weather information, or were not applicable to the circumstances which existed at the time of the attempted approach.

82. Under the conditions which existed during the Special VFR approach, Controller Brown had a duty to actively solicit and disseminate PIREP's. Because the window of opportunity available for Brown to solicit PIREP's from the pilot had not yet closed at the time of the crash, Brown cannot be said to have breached this duty. Since the court has found that there were probably no planes in the area within an hour or so prior to Pilot Charlesworth's arrival, Brown did not breach his duty by not disseminating PIREP's to the pilot.

83. Brown had no duty to inform the pilot that he could not see objects or visual references beyond the reported prevailing visibili-

14. *See* Findings of Fact Nos. 93–118.

ty given to the pilot, including the VOR, and Six Mile Hill.

84. Controller Brown had a duty to inform the pilot of reported lowering visibilities in the area northwest of the VOR even though Brown could not see and even though the report may not have been accurate. Brown's failure to do so breached his duty and constituted negligence.

85. Controller Brown had a duty to inform the pilot of dangerous weather or airport conditions known to him, but most likely not known to the pilot. Controller Brown knew about the relative lack of visual references on the airport side of Six Mile Hill, which circumstance would increase the danger of whiteout, and he knew that the pilot, most likely, did not know this information. Controller Brown had a duty to inform the pilot of the increased danger of whiteout because of lack of visual references on the airport side of Six Mile Hill. Brown's failure to do this breached his duty and constituted negligence.

## III. CAUSATION

86. In addition to showing that the FAA personnel were negligent, plaintiffs must also establish that such negligence was a legal proximate cause of the crash. However, it need not be shown that the negligence of FAA personnel constituted the sole cause of the crash.

87. "Liability cannot be predicated upon surmise or conjecture as to the cause of the injury." *Holguin v. Smith's Food King Prop. Inc.*, 105 N.M. 737, 737 P.2d 96, 99 (Ct.App.1987) (citation omitted). "The mere fact that accidents, injuries, or damages have occurred is not evidence that someone has been negligent." *Archibeque v. Homrich*, 88 N.M. 527, 543 P.2d 820, 824 (1975) (citation omitted). Rather, the plaintiff must show that the alleged injury was "proximately caused" by defendants' negligence. The proximate cause of an injury under New Mexico law is that which in a natural and continuous sequence, unbroken by any independent intervening cause, "produces the injury, and without which the injury would not have occurred. It not need be the only

cause, nor the last nor nearest cause. It is sufficient if it occurs with some other cause acting at the same time, which in combination with it, causes the injury." *Martinez v. First National Bank of Santa Fe*, 107 N.M. 268, 755 P.2d 606 (Ct.App.1987), *writ dismissed*, 107 N.M. 308, 756 P.2d 1203 (1988) (citation omitted).

A. *Negligence of Pilot and Cedar City FSS Personnel Before the Air Borne Radio Contact One Half Hour Before the Crash*

88. From the outset, both FAA negligence and pilot negligence marred the events leading up to the plane crash. However, as to each individual act of negligence, the court will not find proximate cause if the negligence of that act is so far spent by the time an accident takes place as to be too small for the law's notice. *Black v. United States*, 441 F.2d 741, 745 (5th Cir.1971). In *Black*, the Fifth Circuit determined that faulty information received 2 hours before the crash, on the same leg of the flight, did not cause the crash when the pilot independently became aware of the danger with sufficient time to avoid it.

89. Serious acts of negligence were committed by the Cedar City FSS personnel and the pilot during the period leading up to the plane's arrival in Albuquerque. However, this pre-Albuquerque negligence was substantially separated in space and time from the actual crash. The three pre-flight contacts with the Cedar City FSS occurred 26 hours, 10.5 hours, and 7.5 hours respectively, before the plane crashed on February 5. These three contacts took place approximately 24 hours, 8.5 hours, and 5.5 hours before the plane landed safely in Albuquerque, in clear skies and calm weather. The safe landing in Albuquerque constituted a new beginning, a major break in the causal chain. Moreover, while on the ground in Albuquerque the pilot was alerted that there was a storm in Southern New Mexico.

90. The court finds that the pre-Albuquerque negligence of both the pilot and the Cedar City FSS personnel, while serious, had far spent itself and was too small for the law's notice by the time the plane crashed near Roswell. Accordingly, the court finds

no proximate cause between the pre-Albuquerque negligence of the pilot, or the Cedar City FSS, and the actual crash. For proximate cause purposes, the court will concentrate solely on the flight between Albuquerque and Roswell.

### B. Negligence of the Pilot and FAA Personnel During the Final One Half Hour Prior to the Crash

#### 1. Pilot Alan Charlesworth

■ 91. Pilot Alan Charlesworth's failure to avoid entering dangerous weather conditions after being actually and constructively warned of the existence of such was a proximate cause of the accident. Because of this failure, Pilot Charlesworth was placed in a difficult position for an inexperienced pilot. The plane crashed after he unsuccessfully attempted a difficult aviation maneuver. But for this failure, the pilot would have been directed to another airport, and the tragic accident which claimed the lives of the pilot and his passengers could have been avoided.

#### 2. FSS Specialist Berrier D. Byrom

■ 92. Specialist Berrier D. Byrom's failure to inform the pilot, during the 2:31 p.m. contact, of the existence of adverse conditions, including the danger of experiencing the whiteout phenomenon on approach to the Roswell Airport, was a proximate cause of the accident. But for this failure, the pilot would have been provided additional warning of the seriousness of the conditions into which he was taking himself and his passengers, and the accident may have been avoided.

93. Specialist Byrom's failure to give the pilot a VNR recommendation during the 2:31 p.m. contact was a proximate cause of the accident. But for this failure, the pilot would have been given additional warning of the seriousness of the conditions into which he was taking himself and his passengers, and the accident may have been avoided.

94. Specialist Byrom's failure to solicit PIREP's from this pilot was not a proximate cause of the accident. The pilot would have received no more information than he already possessed had Byrom complied with his duty to actively solicit PIREP's from pilots contacting the Roswell FSS.

95. Specialist Byrom's failure to provide the pilot with pertinent NOTAM's during the 2:31 p.m. contact was not a proximate cause of the accident. The pilot obtained these NOTAM's from the Roswell Tower in sufficient time for the pilot to hear, consider, and act upon the information contained therein.

#### 3. Controller Charles Brown

■ 96. Controller Charles Brown's failure to warn the pilot of the possibility of experiencing the whiteout phenomenon, and specifically the increased possibility of this occurrence due to the relative lack of visual references on the airport side of Six Mile Hill, was a proximate cause of the accident. But for this failure, the pilot would have had additional warning of the seriousness of the conditions into which he was taking himself and his passengers, and the accident may have been avoided. Controller Brown's failure to inform the pilot that reportedly reduced visibilities existed in the area northwest of the VOR was also a proximate cause of the accident. That report, even if inaccurate, would have provided additional warning to the pilot of the seriousness of conditions, and the accident may have been avoided.

## IV. COMPARATIVE NEGLIGENCE AND SEVERAL LIABILITY; APPORTIONMENT OF FAULT

97. New Mexico applies the doctrine of "pure" comparative negligence. N.M.Stat. Ann. § 41–3A–1 (1993); *Scott v. Rizzo*, 96 N.M. 682, 634 P.2d 1234, 1242 (1981). This means that a plaintiff's total damages will be apportioned between the parties in proportion to their fault. A plaintiff may recover that portion of the total dollar amount attributable to a defendant's negligence, even if the plaintiff's own negligence is greater than the defendant's or greater than 50% of the total. N.M.Stat.Ann. § 41–3A–1(B) (1993); *Scott v. Rizzo*, 634 P.2d at 1242.

■ 98. New Mexico has recently codified its rule of "several" liability in those cases where the doctrine of comparative negligence applies. N.M.Stat.Ann. § 41–3A–1

(1993). Under the rule of several liability, a defendant is not required to pay another defendant's or a negligent plaintiff's share of the damages. Hence, if the pilot Charlesworth is found to be partially at fault for the damages suffered, the Webb and Riding plaintiffs, while not negligent themselves, will receive a damage award reduced by the proportion of fault attributed to the pilot Charlesworth.

99. An exception to this rule exists for those instances in which application of joint liability has a sound basis in public policy. N.M.Stat.Ann. § 41–3A–1(C)(4) (1993). The court finds no basis in the public policy of New Mexico to depart from the general rule of several liability in this case. The court apportions the fault which proximately caused the accident as follows: Pilot Charlesworth and plaintiffs 60%; FAA employees 40%

## V. DAMAGES

### A. *Economic Damages*

100. This court finds that based on the foregoing findings of fact and conclusions of law, plaintiffs are entitled to the following economic damages:

| | |
|---|---|
| Webb Plaintiffs | $310,608.00 |
| Riding Plaintiffs | $455,603.00 |
| Charlesworth Plaintiffs | $828,996.00 |

### B. *Noneconomic Damages—Loss of Consortium*

101. New Mexico law currently does not recognize a plaintiff's right to recover for loss of consortium. *Solon v. Wek Drilling Co., Inc.*, 113 N.M. 566, 829 P.2d 645, 650 (1992) (citations omitted). The issue is again before the New Mexico Supreme Court, but as of the time of this decision, the supreme court has not yet rendered its opinion on the matter. *Sears v. Nissan Motor Co.*, No. 20441 (N.M. filed March 10, 1992). Accordingly, this court defers judgment as to plaintiffs' claim for loss of consortium damages until the New Mexico Supreme Court issues its opinion in *Sears*.

102. Plaintiffs argue that Utah law should be applied to the damages portion of this case. The choice of law rule of *lex loci delicti* directs that the law of the "place of wrong" apply to both the liability and damages portion of the claim. New Mexico courts have applied the law of another state to a portion of an action if, in the particular circumstances, the technical application of New Mexico law would violate New Mexico's own public policy. *Hughes v. Hughes*, 91 N.M. 339, 573 P.2d 1194 (1978).

103. This necessarily rare exception does not apply to this case. As of the date of this decision, the law in New Mexico denies plaintiffs recovery for loss of consortium. That law is the best available indicator of New Mexico public policy regarding the damages to which tort plaintiffs are entitled.

104. Plaintiffs argue that not applying Utah law to the damages portion of the case violates the Due Process Clause and the Full Faith and Credit Clause. Plaintiffs' argue that because New Mexico recognizes a survival action but not one for wrongful death, the Full Faith and Credit Clause require this court to apply Utah law to the damages portion of the case. Plaintiffs' argument is meritless. A survival action provides plaintiffs' an adequate alternative to a wrongful death action. The Full Faith and Credit Clause does not require a state to award more favorable damages to out-of-state plaintiffs simply because such damages could have been obtained if the law of the plaintiffs' home state had been applied.

Based on the foregoing, it is hereby

ORDERED that judgment be entered for Plaintiffs, $310,608.00 for the Webb Plaintiffs, $455,603.00 for the Riding Plaintiffs, and $828,996.00 for the Charlesworth Plaintiffs. It is

FURTHER ORDERED that the court's ruling concerning loss of consortium damages is deferred pending the New Mexico Supreme Court's decision in *Sears v. Nissan Motor Co.*

Counsel for plaintiffs are directed to prepare and lodge with the court a form of judgment consistent with these Findings and Conclusions, after first complying with local Rule 206(b).

IT IS SO ORDERED.

## APPENDIX A

Transcript First Contact
February 4, 1988, at 1:04 p.m.

* Taken from the official transcript prepared by the manager of the Cedar City FSS.

| | | |
|---|---|---|
| | CCFSS: | FSS Specialist James O. Walstad |
| | Pilot: | Pilot Alan R. Charlesworth |
| 2004:36 | CCFSS: | Cedar City Flight Service Walstad speaking. |
| 2004:38 | Pilot: | Uh yes my name's Alan Charlesworth and I'm gunna be flying an archer and I need to get a weather briefing uh for tomorrow uh day just kind of a general outlook of what it's gunna be like. |
| 2004:50 | CCFSS: | Ok [chances] of some fog and haze along the Wasatch Front again as it has this all every morning this week due to temperature inversions holding the warm air off the city underneath the very cold air above that will burn off and improve as the morning goes on as it has today and yesterday their calling for visibilities as low as three miles in fog and haze this evening a possibility of as low as a mile and a half during the night but then improving improving to three miles shortly after sun up improving to greater than five miles by eleven o clock Salt Lake time. |
| 2005:29 | Pilot: | Now |
| 2005:30 | CCFSS: | Uh (unintelligible) |
| 2005:31 | Pilot: | Oh excuse me |
| 2005:32 | CCFSS: | (unintelligible) |
| 2005:33 | Pilot: | I'm going to be going to Roswell New Mexico |
| 2005:34 | CCFSS: | Ok once [you're] away from the Wasatch Front the high pressure system that's currently over Nevada will have moved over the rockies during the night and will effect all routes down to the south-east up to and including Roswell New Mexico during the day time [tomorrow] they are forecast unlimited VFR along that route and at the destination |
| 2005:55 | Pilot: | So it sounds like it would be fairly good |
| 2005:57 | CCFSS: | It sounds like once your away from the Wasatch Front and the temperature inversion you should be able to fly to Roswell it looks as [a] general idea the later in the day you start the better the weather will be for ya |
| 2006:08 | Pilot: | Right right |
| 2006:09 | CCFSS: | So I would not set my alarm clock for four in the morning I'd let somebody nudge me awake about eight o clock or somethin |
| 2006:14 | Pilot: | Ok so if we if we took off about eight o clock the only reason why is we want to get down there and come back in one day |
| 2006:21 | CCFSS: | Uh uh |
| 2006:22 | Pilot: | Uh da you we |
| 2006:23 | CCFSS: | I don't see any problem with it if you wait for the sun to be up that first hour or so just to see what's developing on the fog and haze |
| 2006:29 | Pilot: | Ok |
| 2006:30 | CCFSS: | Right now it looks good looks very flyable but you'll have to check in the morning for more detail. |
| 2006:34 | Pilot: | Ok thank you |
| 2006:36 | CCFSS: | Ok aircraft number please |
| 2006:37 | Pilot: | Ok it is aircraft number eight for seven one foxtrot and I'm a VFR pilot |
| 2006:44 | CCFSS: | Eight for seven one foxtrot we'll talk to ya in the mornin |
| 2006:45 | Pilot: | Ok thank you |

**1524**

| | | |
|---|---|---|
| 2006:47 | CCFSS: | Your Welcome |
| 2006:48 | Pilot: | Bye |
| 2006:49 | CCFSS: | Bye |

## APPENDIX B
Transcript of Second Contact
February 5, 1988, at 4:33 a.m.

*Taken from the official transcript prepared by the manager of the Cedar City FSS.

CCFSS: FSS Specialist James O. Walstad
Pilot: Pilot Alan R. Charlesworth

| | | |
|---|---|---|
| 1133:39 | CCFSS: | Cedar City Flight Service Walstad speaking good morning |
| 1133:41 | Pilot: | Morning uh I need to get uh flight uh a weather briefing from uh here to Roz uh from Salt Lake City to Roswell New Mexico |
| 1133:50 | CCFSS: | Ok hold on lets see if my system is workin we've been havin problems with it all night.... well we're still in a non weather status damn it pardon the language we've been uh havin a computer shut down all night this is what four hours we've been workin on it |
| 1134:18 | Pilot: | Uh huh |
| 1134:19 | CCFSS: | And we just don't have it back how soon do you have to leave |
| 1134:23 | Pilot: | Ell uh I'll leave about five thirty |
| 1134:26 | CCFSS: | Ok I can give you a very general weather brief but not the current weather along that route |
| 1134:32 | Pilot: | Ok |
| 1134:34 | CCFSS: | Ok we're expecting haze and fog conditions to exist around Salt Lake with a possibility of visibilities three to five miles outside of the immediate area of Salt Lake all the rest of Utah will be high thin cirrus visibilities unrestricted by dropping if you can get out of Salt Lake you'll see the conditions there locally your best bet is to drop straight south plan on entering Arizona because we've got a little pocket of fog and haze over between Grand Junction and Farmington also drop down to central Arizona and then straight east to Roswell they do have some fog conditions in the Roswell area but not in Albuquerque or Santa Fe so you can check the weather as you go along and see just how far you can go all of these conditions are fog and haze and expected to dissipate and improve later on in the day even by late morning in Salt Lake they're expecting visibilities greater than five miles after ten o clock over in the Farmington area they expect greater than five miles after one o clock in the afternoon and in the Roswell area the forecast says slow but steady improvement all day visibility five or greater by noon so |
| 1135:54 | Pilot: | That's what we're lookin at |
| 1135:55 | CCFSS: | That's what your lookin at you don't want to leave at the crack uh dawn but you can leave late morning and it will look good fairly much all the way across |
| 1136:04 | Pilot: | Looked out my door here I'm about ten miles from the airport I can I can probably see clear to the point of the mountain which is probably twenty miles |
| 1136:13 | CCFSS: | Much better than uh earlier forecast see we haven't been getten any weather out of em all night long with this system down the last thing I have to go on is the weather depiction taken at uh ten hundred Z so that's an hour and a half ago so they could've very well had improvement since then |
| 1136:30 | Pilot: | Let me file a flight plan with with you here |
| 1136:32 | CCFSS: | Ok sir I am ready to copy I'm really sorry about the weather but without the tools I guess nobody can to the job |
| 1136:40 | Pilot: | Ok that's I called and talked to ya yesterday |
| 1136:42 | CCFSS: | Ha ho ok |
| 1136:43 | Pilot: | You gave me a pretty good brief |
| 1136:45 | CCFSS: | Alright I'm ready to copy |

| | | |
|---|---|---|
| 1136:47 | Pilot: | VFR flight aircraft ID is eight for seven one foxtrot |
| 1136:54 | CCFSS: | Um your right you did talk to me |
| 1136:56 | Pilot: | Uh piper archer (clear throat) true airspeed hundred twenty five knots Salt Lake departure point is SLC uh Salt Lake number one departure time uh lets say five AM |
| 1137:14 | CCFSS: | OK that'll be twelve hundred greenwich |
| 1137:16 | Pilot: | Lets lets go uh twelve thirty then |
| 1137:20 | CCFSS: | Ok |
| 1137:21 | Pilot: | Uh cruising altitude will be ninety five hundred feet route of flight will be the international to Spanish Fork to Price to Moab to Dove Creek to Cortez then to Farmington we'll land there and fuel up then we'll go to Albuquerque Ronna to Roswell uh estimated time enroute five hours no special remarks fuel on board is five hours alternate airports will be if we can't land in Farmington we will probably land go back to Cortez |
| 1138:22 | CCFSS: | Ok |
| 1138:23 | Pilot: | Uh pilots name is Alan ALAN last name is Charlesworth CHARLESWORTH home address is eight five eighteen Meadowlark MEADOWLARK Lane in West Jordan JORDAN Utah eight four oh eight eight my home number is area code eight oh one five six nine two nine three eight and uh the aircraft's home base is at Salt Lake number one or the international number on board will be three and color of the plane is mostly white with a brown and blue stripe |
| 1139:16 | CCFSS: | Ok again my recommendation if you encounter that low lying fog and haze especially in the Farmington Cortez area it'd be to drop south back into Arizona if necessary and it's all VFR every thing in Arizona |
| 1139:31 | Pilot: | Um |
| 1139:32 | CCFSS: | Albuquerque itself is good and Santa Fe is good right at the moment |
| 1139:37 | Pilot: | (unintelligible) |
| 1139:39 | CCFSS: | So and if with you know good steady improvement shouldn't be too much of a problem |
| 1139:43 | Pilot: | Why don't you put us down as if uh we instead of Cortez uh think goin to Albuquerque because Albuquerque from Farmington is probably another hour |
| 1139:52 | CCFSS: | Ok we'll put ya down for Farmington socked in you're going to Albuquerque very good give us a call when you're airborne so we can open your flight plan give use some pilot reports as you go |
| 1140:03 | Pilot: | Ok |
| 1140:04 | CCFSS: | You have a nice morning sir |
| 1140:05 | Pilot: | One two two point two |
| 1140:06 | CCFSS: | Ya one two two point two or one two two point four either one |
| 1140:09 | Pilot: | Ok thanks |
| 1140:10 | CCFSS: | You bet have a nice morning |

## APPENDIX C

Transcript of Third Contact
February 5, 1988, at 7:17 a.m.

| | | |
|---|---|---|
| * Taken | from the official | transcript prepared by the manager of the Cedar City FSS. |
| | CCFSS: | FSS Specialist Burton C. Poulson |
| | Pilot: | Pilot Alan R. Charlesworth |
| 1417:50 | CCFSS: | Good morning |
| 1417:52 | Pilot: | Uh yes I need to get a weather briefing uh for this morning Salt Lake International to uh Roswell New Mexico |
| 1418:04 | CCFSS: | Ok uh you goin uh IFR or VFR |
| 1418:07 | Pilot: | VFR |
| 1418:11 | CCFSS: | Ok VFR is not recommended Salt Lake City at this time because of IFR conditions forecast to remain that way improving some |

| 1418:36 | Pilot: | what uh hold on for a minute let me get ya the rest of the weather if you'd like.... what time were ya planin on leavin Well uh I called earlier today and I got flight uh briefing and they said that as soon as we got out ah Salt Lake valley that it be ya know quite nice flying but we're sitten out here at the airport just wondering how much longer you anticipate to be fogged in |
| 1418:52 | CCFSS: | Ok uh uh your right after you get out of Salt Lake looks like pretty good uh well actually south of Provo looks like pretty good uh weather just some scattered clouds or clear skies most for most of the area and uh lets see the terminal forecast for Salt Lake City calling for uh from now up until uh eighteen hundred zulu which would be eleven o clock this morning calling for sky partially obscured ceilings six hundred broken one mile fog and smoke occasional sky partially obscured two miles fog and smoke with a chance ceiling three hundred sky obscured one half of a mile light snow fog and smoke and then after eighteen hundred zulu uh improven to sky partially obscured three miles fog and smoke and uh it should remain that way the rest of the day so |
| 1419:55 | Pilot: | At about |
| 1419:57 | CCFSS: | It would be eleven o clock uh improving or still marginal VFR but it'll but be above IFR minima anyway |
| 1420:05 | Pilot: | Ok alright I appreciate that that helps me out a little bit |
| 1420:08 | CCFSS: | Ok what is your aircraft number |
| 1420:10 | Pilot: | Ah lets see it's eight four seven one foxtrot |
| 1420:15 | CCFSS: | Ok thank you |
| 1420:16 | Pilot: | Thank you bye |

## APPENDIX D

Record of Fifth Contact
February 5, 1988, 2:31 p.m.

PERSONNEL STATEMENT

FEDERAL AVIATION ADMINISTRATION
Roswell Flight Service Station
Roswell, New Mexico

February 12, 1988

The following is a report concerning the accident to aircraft N8471F near Roswell, New Mexico, February 5, 1988 at approximately 2200 UTC.

My name is Berrier D. Byrom (OM). I am employed as an Air Traffic Control Specialist by the Federal Aviation Administration at the Roswell Flight Service Station, Roswell, New Mexico.

During the period 1500 UTC to 2300 UTC, February 5, 1988 I was on duty at the Roswell Flight Service Station. I was working the inflight and preflight positions combined from 1500 UTC to 2247 UTC.

At 2131 UTC, the pilot of N8471F called Roswell FSS and requested the current Roswell weather. I issued the Roswell weather. The pilot then asked if the weather was "Good enough for a special VFR into Roswell". I replied that the weather was VFR and instructed him to contact Roswell Approach Control on 119.6 MHZ or Roswell Tower on 118.5 MHZ. The pilot acknowledged.

I had no further communication with the aircraft.

/s/
_____
BERRIER D. BYROM
Roswell Flight Service Station

## APPENDIX E

Transcript of Sixth Contact
February 5, 1988, at 2:48 p.m.

\* Taken from the official transcript prepared by the manager of the Roswell Tower, George R. Swenson, and from the transcript prepared by Arnold W. Scott, the National Transportation Safety Board's Air Safety Investigator.

| | | |
|---|---|---|
| | Tower: | Controller Charles Brown |
| | Pilot: | Pilot Alan R. Charlesworth |
| | Approach: | Controller Weldon R. Steen |
| 2148:34 | Pilot: | Roswell control tower archer eight four seven one foxtrot we're ninety five hundred feet twenty four miles north of the airport we'll be descending to ah land with a VFR landing |
| 2148:48 | Tower: | Archer eight four seven one foxtrot Roswell weather two ah one two one three six special observation measured ceiling six hundred broken one thousand six hundred overcast visibility five light snow showers and fog wind zero niner zero at five altimeter three zero four five what are your intentions |
| 2149:11 | Pilot: | Landing at Roswell full stop |
| 2149:15 | Tower: | The field is IFR archer eight four seven one foxtrot |
| 2149:29 | Tower: | Archer eight four seven one foxtrot the field is IFR over |
| 2149:34 | Pilot: | The field is IFR oh kay we are VFR can you ah direct us to another airport |
| 2149:43 | Tower: | What are you requesting archer eight four seven one foxtrot |
| 2149:48 | Pilot: | We're requesting a special VFR landing |
| 2149:52 | Tower: | Roger an understand you're north of the airfield is that right |
| 2149:57 | Pilot: | Roger |
| 2149:59 | Tower: | Archer eight four seven one foxtrot is cleared into the control zone north of Roswell airport to maintain special VFR conditions at or below five thousand five hundred while in the control zone report entering the control zone and plan a right base to runway two one over |
| 2150:15 | Pilot: | Right base to two one reporting when I'm in the control zone at or below five thousand feet |
| 2150:22 | Tower: | Archer seven one foxtrot roger |
| 2152:12 | Tower: | Archer seven one foxtrot how far north of the airport are you estimating |
| 2152:18 | Pilot: | Ah my dme says seventeen point nine |
| 2152:22 | Tower: | Archer eight four seven one foxtrot roger and ah the northeast portion of runway two one is ah plowed ah fifty feet correction make that the first five thousand feet of runway two one is plowed one hundred feet wide ah seven thousand one hundred feet of the runway open only from the approach end of two one and there is ah twenty eight inch ah snow banks on either side |
| 2152:45 | Pilot: | Ah roger we are at six thousand feet right now |
| 2152:49 | Tower: | Roger |
| (2153) | Pilot: | Roswell control tower archer seven one foxtrot that was a right base for two one |
| 2153:21 | Tower: | Archer seven one foxtrot affirmative from the north be a a right base for two one if you're from the northeast it will be a straight in to two one over |
| 2153:30 | Pilot: | I'm out of the northwest |
| 2153:34 | Tower: | Roger right base report base correction report entering control zone and also base leg runway two one |
| 2153:42 | Pilot: | Roger |
| 2154:23 | Tower: | Archer seven one foxtrot the full ah open portion runway seven thousand one hundred feet is plowed one hundred feet wide |
| 2154:30 | Pilot: | Roger archer seven one foxtrot |
| 2155:34 | Pilot: | Roswell control archer seven one foxtrot we're twelve miles north of the airport |
| 2155:40 | Tower: | Archer seven one foxtrot report on right base runway two one |

| | | |
|---|---|---|
| 2159:33 | Tower: | Archer seven one foxtrot say position |
| 2159:39 | Pilot: | Just crossed a two lane highway |
| 2159:43 | Tower: | Roger |
| 2203:55 | Tower: | Archer seven one foxtrot say position |
| 2204:17 | Tower: | Archer eight four seven one foxtrot Roswell tower |
| 2204:46 | Tower: | Archer eight four seven one foxtrot Roswell tower |

[The court takes the following portions of this record from the transcript prepared by Arnold W. Scott, the NTSB's Air Safety Investigator.]

| | | |
|---|---|---|
| 2205:20 | Tower: | Archer Eight Four Seven One Foxtrot, Roswell Tower. |
| 2206:14 | Tower: | Archer Eight Four Seven One Foxtrot, Roswell Tower. |

[During this period, the Roswell Tower and FSS continued their attempts to locate Pilot Charlesworth]

| | | |
|---|---|---|
| 2208:46 | Approach: | The Archer was given at or below five thousand. Maintain six and report Topan and if we don't get something ... We got fairly good visibility. I think all the clouds are outside the marker. |